DECISION AND JOURNAL ENTRY
 INTRODUCTION {¶ 1} Lamont S. Brown was convicted of endangering and raping his ten-year-old nephew. He has argued that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. This Court reverses his conviction for child endangering because the State failed to present evidence that, if believed, proved that he tortured or cruelly abused his nephew. It affirms his conviction for rape, however, because the State did present evidence, primarily in the form of the nephew's testimony, that, if believed, proved beyond a reasonable doubt that Mr. Brown committed that crime and because the jury did not lose its way and create a manifest miscarriage of justice by believing Mr. Brown's nephew and disbelieving Mr. Brown. *Page 2 
 SUFFICIENCY {¶ 2} Mr. Brown's first assignment of error is that his convictions are not supported by sufficient evidence. Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo. State v. Thompkins, 78 Ohio St. 3d 380, 386 (1997);State v. West, 9th Dist. No. 04CA008554, 2005-Ohio-990, at ¶ 33. This Court must determine whether, viewing the evidence in a light most favorable to the prosecution, it would have convinced an average juror of Mr. Brown's guilt beyond a reasonable doubt. State v. Jenks,61 Ohio St. 3d 259, paragraph two of the syllabus (1991).
 {¶ 3} Mr. Brown was convicted of violating Section 2919.22(B)(2) of the Ohio Revised Code, Endangering Children, for allegedly torturing or cruelly abusing his nephew by striking him with a leather belt. He was convicted of violating Section 2907.02(A)(1)(b) of the Ohio Revised Code, Rape, for allegedly engaging in sexual conduct with his nephew, a child less than thirteen years old. Sexual conduct is defined at Section 2907.01(A) of the Ohio Revised Code as including, "without privilege to do so, the insertion, however slight, of any part of the body . . . into the . . . anal opening of another." Mr. Brown allegedly inserted his penis in his nephew's anus. The trial court sentenced him to two years in prison on the endangering children conviction and to life in prison on the rape conviction, the sentences to be served concurrently.
 {¶ 4} Lamont Brown lived with his mother and his brother's two sons, who were ten and three. His mother, Theresa Brown, worked, but Lamont did not. Theresa's sister, Hope Brown, babysat Lamont's younger nephew at her home while Theresa worked and the older nephew was at school. Hope routinely picked up the older nephew at Theresa's house after he participated in after-school programs. She fed both nephews dinner at her house. Theresa would *Page 3 
pick up the boys after she was done with work and take them back to her house, where they slept.
 {¶ 5} On the morning of January 27, 2005, when Theresa dropped the older nephew off at school, she picked up his report card. His grades had gotten worse since the previous marking period. When Theresa returned home, she showed Lamont the report card. According to Lamont, he was upset because he had worked with his nephew, trying to help him improve his grades. He was also upset because, according to him, the teachers' comments on the report card indicated that the nephew was talking in class instead of paying attention.
 {¶ 6} Apparently there were no after-school programs that day because it was report card distribution day. Lamont's nephew, therefore, arrived home earlier then usual. Lamont was not home. The nephew testified that he worked on his homework, did his chores, and was in the bathroom when Lamont got home. According to the nephew, Lamont came upstairs, called his name, and went in his own bedroom. The nephew testified that, when he was done in the bathroom, he went to Lamont's bedroom and asked what he wanted. According to the nephew, Lamont said he had seen his report card and reminded him that Lamont had warned him that he would be punished if he got bad grades. The nephew said that Lamont told him to take down his pants, but not his underpants, and to bend over Lamont's bed. When he did, Lamont "whipped" him "real hard with his leather belt."
 {¶ 7} The nephew testified that Lamont then told him to go to the bedroom the nephew and his brother shared with Theresa and take his pants off. The nephew said he went in the bedroom, took his pants off, leaving his underpants on, and got in the bed that he and his brother shared with Theresa. He said that Lamont came in the room, sat on the bottom of the bed, and watched television for a short time. According to the nephew, Lamont then left the room and *Page 4 
returned, with nothing on but a black T-shirt. According to the nephew, Lamont pulled back the covers, got on the bed, pulled down the nephew's underpants, and rubbed Vaseline on the nephew's "butt" and in his anus. The nephew testified that Lamont then inserted his penis in the nephew's anus, which hurt. The nephew said he screamed, jumped up, pulled his underpants up, and put his pants back on. He testified that Lamont told him: "this wouldn't have happened if you didn't have bad grades." The nephew testified that Lamont went back to his own room and closed the door.
 {¶ 8} According to the nephew, the telephone rang a few minutes later, and Lamont came back in Theresa's room to answer it. Theresa's sister, Hope, testified that she used her cell phone to call the house while sitting in her car just outside and asked Lamont to send the older nephew out. Lamont suggested that she instead send the younger nephew in and that he would watch both of them. Hope testified that Lamont had never before offered to watch the boys. She told him that she had already prepared their dinner, and he agreed to send the older nephew out. The nephew testified that, as he was getting ready to leave the house, Lamont told him that he was sorry for what had happened, "but don't tell nobody."
 {¶ 9} Both Hope and the nephew testified that the nephew was crying when he came out of the house and got in her car. Hope returned to her own home with the boys and fed them. Later, according to both Hope and the nephew, he told Hope he had something to tell her and asked if she would promise not to tell anybody. She testified that she agreed to not tell. Hope testified that the nephew then asked whether it was right "for a guy to stick his thing in his behind." The nephew testified that he asked her whether it was right for Lamont "to stick his penis in my butt." Hope testified that she told the nephew that someone who would do that was sick and needed help. She said that the nephew then told her that Lamont had done it to him. *Page 5 
Hope testified that she told the nephew to wear the same clothes to school the following day and to tell his teacher what had happened.
 {¶ 10} The next morning, the nephew first told his teacher and then his principal that his uncle had touched him. Someone from Children Services Board apparently picked up the nephew at school and took him to Akron Children's Hospital. At the hospital, a social worker interviewed him, and a pediatric nurse practitioner examined him. During the interview, a video tape of which was played at Lamont's trial, the nephew recited the same events to which he later testified at trial. At trial, the nurse practitioner identified a number of photographs of Lamont's nephew that showed bruises on his thigh, lower abdomen, and buttocks. She also testified that she did not see any trauma to the nephew's anal area, but that it is not unusual for children who claim anal penetration to have no visible injuries.
 {¶ 11} The nurse practitioner collected the underpants the nephew was wearing when she examined him. The nephew testified that they were the same underpants he had worn on the previous day when Lamont had allegedly raped him. A forensic scientist employed by the Ohio Bureau of Criminal Identification and Investigation testified that he found seminal fluid on the inside back of the underpants. A second forensic scientist from the Ohio Bureau of Criminal Identification and Investigation testified that she compared the DNA profile of the seminal fluid found on the underwear with a DNA sample taken from Lamont and determined that he could not be eliminated as the source of that fluid. She further testified that the expected frequency of occurrence of that DNA profile is one in ninety-two billion, seven hundred sixty million.
 {¶ 12} The first issue presented by Lamont's first assignment of error is whether his conviction for torturing or cruelly abusing his nephew is supported by sufficient evidence. This Court has determined that the term "abuse," as used in Section 2919.22(B)(2), means to "ill-use, *Page 6 
maltreat; to injure, wrong or hurt." State v. Nivert, 9th Dist. No. 16806, 1995 WL 608415 at *2 (Oct. 18, 1995) (quoting I Oxford English Dictionary 44-45 (2d ed. 1933)). "Torture," as used in that same section, means: "(1) the infliction of severe pain or suffering (of body or mind); (2) acting upon violently in some way, so as to strain, wrench, distort, twist, pull or knock about." Id. (quoting XI Oxford English Dictionary 169-170 (2d ed. 1933)). Finally, to treat someone "`cruelly' is to: (1) demonstrate indifference to or delight in another's suffering; (2) treat severely, rigorously, or sharply."Id. (quoting II Oxford English Dictionary 1216-1217 (2d ed. 1933)).
 {¶ 13} The jury convicted Lamont of torturing or cruelly abusing his nephew for hitting him with a belt. In State v. Rackley, 9th Dist. No. 13441, 1988 WL 126778 (Nov. 16, 1988), this Court affirmed a defendant's conviction for torturing or cruelly abusing his seven-year-old stepson based on evidence that he had whipped the boy thirty to forty times with a leather belt, causing him to cry with such intensity and duration that a neighbor called the police. A physician testified that the boy was still in pain three hours later and that his wounds would "possibl[y]" leave permanent scars. Similarly, in State v. Surles, 9th Dist. No. 23345, 2007-Ohio-6050, and State v. Surles, 9th Dist. No. 23340,2007-Ohio-2733, this Court affirmed convictions of a husband and wife for torturing or cruelly abusing the wife's daughters, who were six and eight years old, by striking them repeatedly with a wet belt while restraining them with a second belt wrapped around their ankles. There was evidence that each girl was struck between ten and twenty times. A physician testified that, while some bruises inflicted on the girls were superficial, others were deep. Both girls said they were still experiencing pain the following day. This Court concluded: "If the evidence is believed, [the mother's] actions went *Page 7 
far beyond normal parental discipline. Rather, she inflicted severe pain and suffering on her daughters, thereby torturing and cruelly abusing them." Surles, 2007-Ohio-2733, at ¶ 13.
 {¶ 14} In this case, the nephew testified that Lamont had "whipped [him] real hard" and that it "hurt." When asked what he was doing while being hit, he responded that he "was crying." Lamont acknowledged using his belt to strike his nephew, saying that he had hit him four times. He testified that, when he was done, his nephew was "crying pretty bad." He claimed that he gave his nephew Neosporin and told him to "apply it to any areas necessary if he needs it." As mentioned earlier, the nurse practitioner who examined the nephew identified a number of photographs that showed bruises on his thigh, lower abdomen, and buttocks. The nephew did not suggest that Lamont had struck him on the lower abdomen, and the nurse practitioner acknowledged that the bruise on the abdomen was shaped differently from the bruises on the buttocks. She acknowledged that the bruises she saw on the nephew were possibly consistent with him having been struck four times. She did not indicate that the bruises were deep or that they could result in permanent scaring. The nephew did not indicate that he was still experiencing pain the next day or even later the same evening.
 {¶ 15} The evidence in this case regarding Lamont's use of the belt on his nephew was more consistent with normal discipline than the evidence in Rackley or the Surles cases. Viewing the evidence in a light most favorable to the State, it would not have convinced an average juror beyond a reasonable doubt that Lamont tortured or cruelly abused his nephew by striking him with the belt. His conviction for torturing or cruelly abusing his nephew, therefore, is not supported by sufficient evidence. To the extent his first assignment of error is addressed to his conviction for violating Section 2919.22(B)(2) of the Ohio Revised Code, it is sustained. *Page 8 
 {¶ 16} The second issue presented by Lamont's first assignment of error is whether his conviction for raping his nephew is supported by sufficient evidence. It was undisputed that the nephew was ten years old at the time Lamont allegedly raped him. The nephew testified that Lamont inserted his penis in the nephew's anus. That testimony, if believed, would have convinced an average juror beyond a reasonable doubt that Lamont raped his nephew and, therefore, was sufficient to support the jury's conclusion that Lamont committed rape. To the extent Lamont's first assignment of error is a challenge to the sufficiency of the evidence to support his conviction for violating Section 2907.02(A)(1)(b) of the Ohio Revised Code, it is overruled.
 MANIFEST WEIGHT {¶ 17} Lamont's second assignment of error is that his convictions are against the manifest weight of the evidence. When a defendant argues that his convictions are against the manifest weight of the evidence, this Court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Otten, 33 Ohio App. 3d 339, 340 (1986).
 {¶ 18} While Lamont admitted striking his nephew with a belt, he denied raping him or, for that matter, being upstairs with him on the afternoon of the alleged rape. According to Lamont, he spent the afternoon at a friend's house, arriving home around 4:50 p.m. He said his nephew came downstairs immediately after he arrived home, and that that was where he confronted him about his bad grades. He said his nephew "got an attitude" and was "unresponsive" to a lot of his questions. Lamont testified that he then told his nephew to pull *Page 9 
down his pants, and he struck him four times with a belt. Lamont said the nephew pulled his pants up and Lamont gave him Neosporin. According to Lamont, he then told his nephew to "grab all of his papers, get them together so we can sit down and we're definitely going to go over what you're struggling with in school." He testified that, in the middle of going over the nephew's papers, Hope blew her horn outside. Hope testified that she had gotten there around 4:55 p.m. Lamont said he called Hope on her cell phone, told her about the nephew's report card, and suggested that she send the younger nephew in so that he could continue working with the older nephew. He said she told him she had already prepared dinner for both boys, so he agreed to send the older boy out. Lamont estimated that he and his nephew were alone together for no more than six to eight minutes.
 {¶ 19} Lamont also claimed that his older nephew had a bedwetting problem and that he wet the bed that night. He testified that, the next morning, he saw his nephew take a pair of underpants out of a dirty clothes bag in the bathroom and put them on. Lamont testified that he and his girlfriend were sexually active, and his lawyer suggested that the seminal fluid found on the inside back of the nephew's underpants could have been the result of cross-contamination occurring in the dirty clothes bag.
 {¶ 20} The nephew denied that he either had a bedwetting problem or had wet the bed that night. As mentioned previously, he testified that the underpants that were taken from him at the hospital were the same underpants that he had been wearing the previous day when Lamont allegedly raped him.
 {¶ 21} To the extent Lamont's second assignment of error is addressed to his conviction for torturing or cruelly abusing his nephew, it is moot and is overruled on that basis. Inasmuch as this Court has concluded that there is insufficient evidence to support that conviction, there is *Page 10 
no evidence to weigh in order to determine whether it is against the manifest weight of the evidence.
 {¶ 22} Having reviewed the entire record and weighed the evidence that was before the jury regarding Lamont's alleged rape of his nephew, this Court concludes that that conviction is not against the manifest weight of the evidence. The jury did not lose its way and create a manifest miscarriage of justice by disbelieving Lamont's testimony and believing his nephew's testimony. His nephew's credibility was bolstered by the seminal fluid matching Lamont's DNA that was found on the inside back of his underpants. Lamont's suggestion that this occurred through cross-contamination was not credible. To the extent Lamont's second assignment of error is addressed to his rape conviction, it is overruled.
 CONCLUSION {¶ 23} To the extent Mr. Brown's first assignment of error is addressed to his conviction for violating Section 2919.22(B)(2) of the Ohio Revised Code, it is sustained and that conviction is reversed. To the extent his first assignment of error is addressed to his conviction for violating Section 2907.02(A)(1)(b) of the Ohio Revised Code, it is overruled. His second assignment of error is also overruled. This matter is remanded to the trial court for further action consistent with this opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
 The Court finds that there were reasonable grounds for this appeal. *Page 11 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to both parties equally.
 SLABY, P. J. WHITMORE, J. CONCUR *Page 1