[Cite as *State v. Fields*, 2018-Ohio-4394.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. John W. Wise, P. J. |
| Plaintiff-Appellee | Hon. Patricia A. Delaney, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2018 CA 00002 |
| BRENT FIELDS | |
| | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:      Criminal Appeal from the Court of Common
Pleas, Case No. 2017 CR 00391


JUDGMENT:      Affirmed


DATE OF JUDGMENT ENTRY:      October 29, 2018


APPEARANCES:

For Plaintiff-Appellee            For Defendant-Appellant

JOHN D. FERRERO            MATTHEW PETIT
PROSECUTING ATTORNEY            116 Cleveland Avenue North
KRISTINE W. BEARD            Suite 808
ASSISTANT PROSECUTOR            Canton, Ohio 44702
110 Central Plaza South, Suite 510
Canton, Ohio 44702

*Wise, P. J.*

**{¶1}** Defendant-Appellant Brent Alan Fields appeals his convictions, in the Court of Common Pleas, Stark County, for murder and multiple counts of child endangering. Appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.

**{¶2}** In the spring of 2016, Appellant Fields met Ruth B., who at that time had five minor sons: R.B., T.B., E.B., B.B., and O.B. Ruth lived on Shorb Ave. NW in Canton with her sons and her aunt, Susan, who usually went by the nickname "Sis." Appellant began increasingly staying overnight with Ruth, and in June 2016, everyone moved to a house on Hoover Place NW in Canton. Ruth frequently worked during the day, leaving appellant to act as the caretaker and disciplinarian during those times.

**{¶3}** Dale Brownfield, who lived nearby on 13th St. NW, often saw the children outside playing after they moved into the Hoover Place residence, but after a time their outdoor presence "mysteriously stopped." Tr. II at 123. Nonetheless, on one occasion in the summer of 2016, Brownfield observed appellant in a garage, repeatedly striking O.B., age three, in the face. *See* Tr. II at 125-126. On another occasion, Brownfield heard whining sounds, and when he got closer, he could hear "repeated smackings" and a child crying out: "Daddy, not my back." Tr. II at 127. Brownfield managed to record part of this incident on his cellphone. His wife contacted Stark County DJFS. At the agency's behest, Brownfield contacted the Canton Police Department, which thereupon conducted a welfare check and eventually obtained the video taken by Brownfield.

**{¶4}** Throughout the summer and early fall of 2016, appellant repeatedly utilized physical beatings on the four boys as what he would later claim was corporal punishment.

{¶5}   On October 15, 2016, O.B. vomited while Ruth was at her job. A few days later, on the afternoon of October 18, 2016, Ruth went to a job interview, leaving the house around 1:30 or 2:00 PM. At about 2:45 PM, appellant sent her a text message urging her to come home, stating that O.B. had thrown up what looked like coffee grounds.

{¶6}   Appellant then called Ruth. During the call, she could hear appellant screaming the child's name. When Ruth arrived home, appellant ran to her van carrying the child.

{¶7}   O.B. was then taken to Mercy Medical Center in Canton. As further discussed *infra*, Canton police officers responded, including Detective Joe Mongold. After trauma teams worked on the child, Mercy officials decided to transfer O.B. to Akron Children's Hospital. Ruth rode in the ambulance to Akron, but before she departed Mercy, she gave police officers permission to search the residence on Hoover Place.

{¶8}   O.B. died in the early morning hours of October 19, 2016. His surviving brothers were thereafter forensically interviewed at the Stark County Children's Network. Tr. II at 165.

{¶9}   On October 20, 2016, Canton police officers again searched the residence on Hoover Place. They also obtained a search warrant for appellant's cell phone.

{¶10} Also on October 20, 2016, Ruth agreed to an interview with Detective Mongold and to engage Fields in a one party consent call. Also, with Ruth's consent, Detective Mongold and Detective Zachary again searched the family home. The officers seized boxing gloves. In addition, prior to the search, appellant voluntarily gave the officers his cell phone.

{¶11} On March 7, 2017, appellant was indicted on one count of murder (R.C. 2903.02(B); 2919.22(B)(1)(E)(2)(d) and/or (B)(2)(E)(3)); one count of endangering children (R.C. 2919.22(B)(1)(E)(2)(d) and/or (B)(2)(E)(3)), a felony of the second degree; and three counts of endangering children (2919.22(B)(3) and/or (B)(4)), felonies of the third degree. The murder charge and first endangering children charge were in regards to the child O.B. The remaining three charges of child endangering were each in regard to three of the other children, R.B., T.B., and E.B.

{¶12} On March 10, 2017, appellant was arraigned and pled not guilty to all charges. Discovery was thereafter exchanged, and the matter proceeded to an evaluation for sanity and competency filed by appellant's counsel.

{¶13} On April 28, 2017, appellant additionally filed a motion *in limine* to exclude photographs of the deceased child, O.B. After a hearing on August 18, 2017, the trial court held that the State would not be permitted to publish the photos of the child's resected bowel and a photo of the child's penis.

{¶14} Additionally on May 12, 2017, appellant filed a motion to suppress, and on May 19, 2017, appellant filed several additional pretrial motions. On August 10, 2017, a suppression hearing was held. The trial court overruled the motion to suppress.

{¶15} The matter proceeded to a jury trial commencing on October 23, 2017. The State first called Sergeant Joshua Coates of the Canton Police Department. He recalled that on October 18, 2016, he was dispatched to Mercy Medical Center for a "trouble call." While his partner spoke with Ruth B., Sergeant Coates walked over to where appellant was speaking with the charge nurse. As the officer approached, appellant looked up and said: "Oh, shit, this isn't good." Tr. I at 192. Appellant also "started moving around

fidgeting and bouncing back and forth from foot to foot." *Id.* Appellant identified himself as O.B.'s "stepfather." Tr. I at 193. Coates eventually left the hospital and assisted in getting the other children home safely after school.

**{¶16}** The next witness was Officer Michelle Kalabon of the Canton Police Department. She assisted at the scene on Hoover Place as the rest of the children returned home from school. She also conducted a welfare check on the residence, finding it "not ideal" for the children, but nonetheless "adequate." Tr. I at 202. She noted that as other officers became involved in the investigation that day and DJFS took over regarding temporary care of the children, *i.e.*, O.B.'s siblings, her duties were completed. Tr. I at 204.

**{¶17}** Officer Jeff Weller of the Canton Police Department testified next. On October 18, 2016, he went to the Hoover Place residence as part of the department's crime scene unit. At the trial, he went over the photographs he had taken of the interior of the house, as well as playground equipment at a park near 12th Street and Whipple Avenue NW at which O.B. had played. Weller also recounted that officers seized two bottles of Melatonin and a worn leather belt from the house. Tr. I at 217.

**{¶18}** The State also presented three of O.B.'s older brothers as witnesses. The first was R.B., age twelve at the time of the trial. He recalled that all the boys were beaten by appellant, who would use a belt, boxing gloves, or his bare fists. Tr. I at 224. He observed that O.B. got beaten the worst by appellant. Tr. I at 225. R.B. remembered seeing appellant hold O.B. out of a second-floor window as another form of punishment. According to R.B., appellant tried to do the same thing to him, but he was big enough to

fight back. Tr. I at 224-226. R.B. also identified the belt that appellant used for whippings. Tr. at 224, 230.

{¶19} T.B., age ten, then described for the jury how appellant would punish him with a belt to his buttocks or with boxing gloves to his chest if he forgot to do the dishes or take out the trash. Tr. I at 248-250. T.B. described the gloves as being designed for kids, such that they barely fit appellant. Tr. I at 269. It felt "bad" to get hit in the chest or stomach with the gloves. Tr. I at 250. T.B. described how appellant would put the boys – sometimes individually, sometimes in a group – in a corner and push heavily-laden shelves behind them to keep them penned in all day. Whoever was in the corner would be allowed to go to bed, but the next morning would be again placed in the corner behind the shelves. Tr. I at 252. T.B. identified a picture he had drawn for purposes of a forensic interviewer, showing O.B. standing in a corner with a chair against his neck. T.B. recalled that in that method of punishment, if the chair fell or moved, he would get hit by appellant. Tr. I at 255-256. T.B. also testified that he observed appellant hanging O.B. out the window by his ankles, while O.B. screamed and cried. Tr. I at 252. T.B. also saw appellant grab and "squeeze" O.B.'s "private part." Tr. I at 253. Finally, T.B. observed red marks on O.B.'s back and chest and, shortly before O.B. passed away, saw him throw up clear liquid with chunks of food. Tr. I at 254.

{¶20} E.B., the third brother, was eight years old at the time of trial. According to E.B., appellant also hit him with a belt and/or boxing gloves and put him in the corner as punishment. Furthermore, appellant beat E.B. when he talked during the time he was in the comer. Tr. I at 277. E.B. also saw his brothers being hit and put in the corner. Tr. I at 274. E.B. once told his mother, Ruth, that he had marks on his back. Tr. I at 283. E.B felt

scared when he saw his brothers being put in the corner. Tr. I at 274. E.B. also saw appellant hold O.B. out of the window, saw red marks on O.B.'s stomach, and saw O.B. throwing up before he went to the hospital. Tr. I at 274-275.

{¶21} Ruth B. was then called to the stand. She told the jury up front that she had already pled guilty to complicity to child endangering and obstructing justice, although her sentencing was still pending. *See* Tr. II at 6. Ruth admitted that she suspected appellant was abusing her children, but she avoided obtaining medical treatment for them because appellant had repeatedly told her that she would lose custody. Tr. II at 21-23. Ruth testified that she saw belt marks on the older boys' arms and buttocks. Tr. II at 22. After the September injuries to O.B., according to Ruth, appellant told her repeatedly that he had taken it "too far." Tr. II at 24. O.B. took a week off of work to care for O.B. at that time. *Id.*

{¶22} Ruth's aunt, Sandra, or "Sis," age seventy-one and a U.S. Army veteran, told jurors that she lived with Ruth and the children during the time frame in question. She was struck by a car in 2002 and has had health issues stemming from that accident. Although she was never an eyewitness to physical abuse toward the boys, she did hear appellant yelling at them and saw him making them stand in a corner. Tr. II at 98. She also recalled that appellant had "relegated" her to her bedroom and prevented her from accessing her social security money. *Id.* at 95-96.

{¶23} After neighbor Dale Brownfield testified, as summarized previously, Canton Police Detective Joe Mongold took the stand. Among his duties in October 2016 was handling child abuse cases. Tr. II at 147. He recalled that when he went to speak with appellant and Ruth B. at Mercy Medical on the afternoon of October 18, 2016, O.B. was

in the ER trauma room. *Id.* at 148. The detective entered the ER and observed and photographed the multiple visible injuries to O.B., particularly bruising on the child's right side and shoulder and bruising on his abdomen, including a "pretty significant size bruise on the left side of his stomach." *Id.* at 148-149. Both appellant and Ruth told him that O.B. had recently fallen from "monkey bars" at the playground. Tr. II at 152.

{¶24} Mongold further recalled that as preparations were being made to transport the child to Akron Children's Hospital, one of the ambulance team members insisted on talking to Ruth without appellant's presence. This apparently made appellant "very irate," and he left Mercy Medical. Tr. II at 155. Ruth thereafter became even more distraught and told the detective that she was afraid, and that she believed appellant had done something to cause harm to O.B. Tr. II at 156. She told the detective that she had observed appellant beating her children, punching them in the chest, stomach, and other parts of their bodies and sometimes hitting them with a belt. Tr. II at 157. Ruth also told the detective that O.B. had "a lot of bruises" on his body and that every time she asked appellant about it, he would say that O.B. had fallen. *Id.* Mongold also mentioned that Dr. Ponsky at Akron Children's Hospital later told him that he had never seen anything like O.B.'s case in his entire career. *Id.* at 163.

{¶25} Mongold also went over the results of the search of appellant's phone. Among other things, evidence was adduced that appellant had conducted Google searches in late September 2016 for information on such things as yellow vomit, dark brown vomit, ways to make bruises go away, green bile, "little kids insides," gastrointestinal bleeding, location of a child's gallbladder and liver, "how long a child can hold their pee," and other medical topics. Tr. II at 180-183.

{¶26} According to Mongold, appellant's phone showed the searched tapering off, but then resuming shortly after midnight on October 18, 2016. Among the searches was a question on children losing baby teeth, followed by several related to children "falling asleep with their eyes open." Tr. II at 184. Later that day, there were searches made regarding home remedies for wound healing, treating brown vomit, and "coffee ground vomitus."

{¶27} Mongold also noted that a number of text messages were exchanged between Ruth B. and appellant. In one of them, dated September 27, 2016, Ruth B. laments that her "heart is breaking in a million pieces right now" about O.B.'s hurting. Appellant responded: "Me fuckin to [sic] and it's my fault." Tr. II at 189-190.

{¶28} The jury also heard a redacted version of Mongold's interview with appellant, and a transcript thereof was entered as a trial exhibit. At one point in said interview, Mongold had asked appellant, in reference to what happened in September 2016, if he had hit O.B. in the stomach with a sledge hammer, a fist, or something else. Appellant replied: "No it wasn't a sledge hammer it was my fist." Interview Tr. at 231. At one point, appellant indicated that when he would react to O.B.'s misbehaviors, "it didn't *** feel like [O.B.] to me." *Id.* at 237. After some more discussion, Mongold commented: "Instead of seeing [O.B.] you'd see you as a little kid through your dad's eyes." Appellant responded: "Yeah and it would be a different age every time. This tall and this tall. And when I would snap out of it and I realized what I've done and I would tell him I'm sorry. I would tell him sorry and he would say *** it's okay I forgive you. ***." *Id.* at 238.

{¶29} According to the record, as the police interview continued, Mongold subsequently asked appellant: "Was it mainly just punches to [O.B.'s] stomach or was

there other things?" Appellant replied: "It was mainly open hand." Interview Tr. at 239. Mongold then asked if appellant had ever "slammed" the child down. Appellant answered in part: "I never really did it like that. I never really like *** I never really like slammed him or tossed him I just *** everything my eyes like, like right now I see like everything *** in that room would be my old house or any old house where I got disciplined real bad and nobody gave a fuck about me, nobody. ***." *Id.* at 240.

{¶30} Mongold also testified that appellant, in a one-person consent call with Ruth, had later directed her to "stick with the story," *i.e.*, the claim that O.B. had fallen from play equipment at the park. Tr. III at 17.

{¶31} The final State's witness was the Summit County chief medical examiner, Dr. Lisa Kohler, who performed the autopsy on O.B. In the course of the autopsy, Dr. Kohler reviewed O.B.'s medical records from Mercy Medical Center and Akron Children's Hospital. Tr. III at 41. Dr. Kohler also prepared an autopsy report and toxicology report. At trial, Dr. Kohler testified that the medical reports from Akron Children's stated that there was intraperitoneal air in the child's abdominal cavity which generally occurs when there is a hole in the stomach or bowel. The child also had evidence of inflammatory peritonitis which can be caused by injury or infection. She stated that the Akron Children's doctors performed an exploratory laparotomy and found an unusually large amount of brown serous fluid in the child's abdomen. The doctors found the child's bowels to be very inflamed and that portions of his small bowel were necrotic (dead or dying). Tr. III at 55-56. Dr. Kohler testified that the child's abdominal injuries were not consistent with the caregivers' story and had not been caused by a fall from monkey bars. Tr. III at 60. Rather, the injuries were the result of a significant blow to the abdomen,

probably three or more days before the child's hospital visit, which caused his bowel to rupture or become perforated. Tr. III at 56-57, 61.

{¶32} At trial, using a power point presentation, Dr. Kohler testified to the extent of O.B.'s injuries as follows: (1) The child had signs of blunt force trauma to his head, face, nose and right cheek which had been inflicted by another and were not consistent with typical injuries of a three-year-old child. Tr. III at 63; (2) The child had purple bruising from inflicted blunt force trauma to his left ear and left cheek as well as bruising on the left side of his jaw and chin. Tr. III at 63; (3) The child had injuries to the inside of his mouth including a lost tooth and abrasions to his lip. Dr. Kohler stated that his tooth was likely knocked out by a blunt force blow to his mouth, with the abrasions likely being caused by being slapped in the mouth and rubbing against his teeth. Tr. III at 65, 84; (4) The child had blunt force injuries to the top of his head which included a linear injury similar to being hit with a long straight object. Tr. III at 67; (5) A photo of O.B.'s reflected scalp revealed that he had bruising on his scalp and skull. The bruising on the scalp was deep into the tissue and appeared to be three or more days old. Tr. III at 68-70; (6) The child's back showed signs of blunt force trauma, healing scrapes, burns on the area of his spine and bruising on his buttocks. Dr. Kohler opined that the burns resembled the end of a cigarette. She stated that none of the marks on the child's back were consistent with being scratched by a dog. Tr. III at 71-73; (7) The child had signs of blunt force trauma to his torso and linear abrasions on his stomach. Tr. III at 74; (8) The child had bruising to his left forearm and wrist and a healed injury to his right hand. Some of the bruising was consistent with a grabbing injury. Tr. III at 75; (9) The child had abrasions

on his penile shaft and the head of his penis possibly consistent with being grabbed and squeezed. Tr. III at 77.

**{¶33}** In her conclusion, Dr. Kohler found that O.B. had died from septic shock, from complications caused by blunt force trauma to his abdomen. Tr. III at 78.

**{¶34}** Appellant himself thereafter testified as the sole defense witness. Among other things, he conceded on cross-examination that "at times" during his interview with Detective Mongold, he had stated that he had never seen Ruth hit the children, although he had also said the opposite. Tr. IV at 54. The trial court also permitted the jurors to submit written questions, one of which was "[w]hat caused all of his bruises?" *Id.* at 63. Appellant answered: "I can't be too sure, but if I had to guess, it would be between him playing around with his brothers, his mother, the fall from the park or the pet store." *Id.* Appellant also testified that his own father had disciplined him with "whippings" when he was a child, and, at least after the age of eleven, had punched him in the stomach as a form of punishment. *Id.* at 68.

**{¶35}** After the presentation of evidence the jury found appellant guilty as charged in the indictment.

**{¶36}** At the sentencing hearing, the defense argued that the convictions for murder and child endangering as to the victim O.B. were allied offenses and should be merged for sentencing purposes. However, the trial court concluded that the two counts were not allied offenses.

**{¶37}** The court proceeded to impose an aggregate consecutive sentence of thirty years to life in prison. *See* Judgment Entry, December 15, 2017.

**{¶38}** Appellant filed a notice of appeal January 3, 2018. He herein raises the following three Assignments of Error:

**{¶39}** "I. THE APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

**{¶40}** "II. THE TRIAL COURT ERRED IN OVERRULLING [SIC] DEFENDANT'S MOTION TO EXCLUDE UNDULY PREJUDICIAL, CUMULATIVE AND INFLAMMATORY EVIDENCE.

**{¶41}** "III. THE TRIAL COUT [SIC] ERRED IN FAILING TO MERGE APPELLANT'S SENTENCES FOR TWO COUNTS OF THE INDICTMENT."

I.

**{¶42}** In his First Assignment of Error, appellant contends his convictions were against the sufficiency and manifest weight of the evidence. We disagree.

**{¶43}** In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

*Sufficiency: Offenses Involving O.B.*

**{¶44}** R.C. 2903.02(B) states as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

{¶45} The predicate offense as to the victim O.B. (also Count II of the indictment) is child endangering under R.C. 2919.22(B)(1)/(2), which states as follows:

No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(1) Abuse the child;

(2) Torture or cruelly abuse the child[.]

\*\*\*

{¶46} Although not stated in R.C. 2919.22, recklessness is the culpable mental state for the crime of child endangering. *State v. Colopy,* 5th Dist. Knox No. 2011–CA–3, 2011–Ohio–6120, ¶ 34, citing *State v. O'Brien* (1987), 30 Ohio St.3d 122, 508 N.E.2d 144 (additional citation omitted).

{¶47} In terms of O.B.'s murder, Dr. Kohler concluded that O.B.'s death was caused by septic shock due to complications of blunt force trauma to his abdomen. Tr. III at 78. We find the evidence presented by the State, as extensively summarized *supra,* in a light most favorable to the prosecution, clearly allowed the jury to make the inference beyond a reasonable doubt that appellant was the perpetrator of the abusive blows to the child's body, causing his death.

{¶48} In regard to the allegation of child endangering as to O.B., we first note R.C. 2919.22 does not define the terms "abuse," "torture," or "cruelly." *See State v. Wainscott*, 12th Dist. Butler No. CA2015-07-056, 2016-Ohio-1153, ¶ 24. However, the word "abuse" has been defined as "ill-use, maltreat; to injure, wrong or hurt, " while the word "torture" as used in R.C. 2919.22(B)(2) has been defined as "the infliction of severe pain or

suffering of body or mind." *State v. Dayton*, 3rd Dist. Union No. 14-17-03, 2018-Ohio-3003, ¶ 17, citing *Wainscott*, *supra*, citing *State v. Surles*, 9th Dist. Summit No. 23345, 2007-Ohio-6050, ¶ 5 (internal punctuation edited). To treat someone 'cruelly' means to "demonstrate indifference to or delight in another's suffering," as well as to treat that person "severely, rigorously, or sharply." *Id.*, citing *Wainscott*, *supra*, citing *State v. Brown*, 9th Dist. Summit No. 23737, 2008-Ohio-2956, ¶ 12 (internal quotations omitted).

**{¶49}** As indicated in our recitation of facts, the jury in this instance heard from multiple witnesses and from some of appellant's own incriminating statements that he had engaged in various acts meant to physically and mentally harm O.B. Evidence was also adduced that appellant tried to advance an accident theory after the child was finally taken to a medical facility shortly before his death. While appellant presently continues to advance a claim that there was a lack of direct evidence tying him to the fatal injuries suffered by O.B., we note we have long emphasized that circumstantial and direct evidence possess the same probative value. *See*, *e.g.*, *State v. Turner*, 5th Dist. Stark No. 1998CA00018, 1998 WL 818769. Upon review of the record, viewing the evidence before us in a light most favorable to the prosecution, we find sufficient direct and circumstantial evidence existed for reasonable fact finders to conclude beyond a reasonable doubt that appellant engaged in child endangering and further caused the resulting death of O.B. as charged. We thus hold said convictions were supported by the sufficiency of the evidence.

## *Sufficiency: Offenses Involving R.B, T.B., and E.B*

**{¶50}** The counts pertaining to O.B.'s brothers were based on R.C. 2919.22(B)(3)/(4), which states as follows:

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

\*\*\*

(3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child;

(4) Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development;

\*\*\*.

**{¶51}** Whether parental discipline is extreme or excessive is determined in light of the totality of the circumstances. *State v. Durbin*, 5th Dist. Holmes No. 13 CA 2, 2013-Ohio-5147, ¶ 26 (additional citations omitted). We again note that recklessness is the culpable mental state for the crime of child endangering. *Colopy*, *supra*. Under the portions of the statute pertinent to the present argument, actual harm to the child need not be realized to establish child endangering, only the circumstances which create a

substantial risk. *See City of Mason v. Rasmussen*, 12th Dist. Warren No. CA2000-08-077, 2001 WL 290248.[1]

**{¶52}** The evidence in this case, as set forth in our recitation of the facts, showed the children were hit with a belt, hit with a closed fist or boxing gloves, and made to stand for hours or even days in a corner behind shelves or with a chair resting on their necks, all at the hands of appellant. The children all observed each other being abused. Ruth testified that she saw excessive bruising on the children and confronted appellant about the marks. T.B. testified that he had marks on his back but didn't show them to anyone. Tr. I at 266. E.B. testified that he had marks on his back and that he showed Ruth. Tr. I at 283. E.B. also testified that he was scared and that he cried when appellant hit him with the boxing gloves. Tr. I at 274, 277. Ruth testified that she often sent the kids to school with clothing that covered the bruises and that she used home remedies to help the wounds heal faster. Tr. II at 30-31. As a result of the abuse, the surviving children were taken from their home, placed in foster care, and thereafter obtained psychological care. Tr. I at 223.

**{¶53}** Viewing the evidence before us in a light most favorable to the prosecution, we hold reasonable triers of fact could have found, beyond a reasonable doubt, that appellant committed the offense of endangering children under R.C. 2919.22(B)(3)/(4).

---

[1] *Rassmussen* involved a misdemeanor conviction under R.C. 2919.22(A), but we find its observation on this point applicable herein.

*Manifest Weight of the Evidence*

**{¶54}** Our standard of review on a manifest weight challenge to a criminal conviction is stated as follows: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. *See also, State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175, 485 N.E.2d 717.

**{¶55}** Appellant's challenge at this juncture essentially questions the weight and credibility of several State's witnesses.

**{¶56}** He first notes that although Officer Coates, who was one of the first officers to respond at Mercy Medical, attributed various admissions to appellant, he was confronted upon cross-examination with the fact that his body camera footage did not show such statements. *See* Tr. at 196. In sum, notwithstanding that this officer was an initial responder only, appellant contends Coates offered "dubious testimony" and that his failure to record any statements from appellant, Ruth, or the medical staff reveals an inadequate investigation.

**{¶57}** As to Detective Mongold, appellant urges that he admitted on cross-examination that appellant, after O.B. began throwing up, had sent photos of the child to his friend Josh, whose mother had medical training, for help in what to do. Tr. III at 26-27. Mongold revealed that while Ruth had deleted "a lot" of the information on her phone,

appellant had not deleted anything on his phone. *Id.* at 28. Appellant charges that Mongold, during his seven-hour interrogation of appellant, made "arguably false inducements" (*id.* at 29) and was instructing Ruth on how to talk to appellant in order to produce an admission. *Id.* at 32. Appellant urges that the record is absent of any testimony by Mongold that definitively established via direct evidence that the injuries causing O.B.'s death were the sole and exclusive result of any act of appellant.

**{¶58}** Regarding Ruth B., appellant maintains her entire testimony immediately becomes suspect due to her circumstances. She testified up front that she had already pled to felony charges regarding her children, and that she was thus motivated to cooperate with the State at the trial. Tr. II at 4-7. She likewise admitted she had "smacked" her children in the buttocks as part of physical discipline. *Id.* at 15-16. She admitted she never actually saw two of the boys, E.B. or O.B., being struck by appellant. *Id.* at 19, 57.

**{¶59}** Appellant also directs us to an apparent discrepancy between Ruth's claim that the children had various arm bruises (Tr. II at 21) and the fact that none of the children in their testimony referred to specific issues with their arms. She then admitted that despite her claim of noticing various bruising injuries, she never thereafter took the children to the doctor. *Id.* at 22. As of October 2016, before O.B. died, appellant was only disciplining the children by having them stand in the corner, according to Ruth. *Id.* at 29. On cross-examination, Ruth apparently could not confirm that she had seen bruises on the other children as of the time O.B. died. *Id.* at 82. In addition, Ruth testified that despite his earlier maladies, in early October 2016, O.B. was keeping down meals and liquids. *Id.* at 32. Indeed, she indicated that on the day she went to the job interview, O.B. was

"fine." *Id.* at 36. She confirmed that appellant attempted CPR on O.B. on the day the child was taken to the hospital. *Id.* at 38.

**{¶60}** Appellant also asks us to consider that Ruth had also originally stated she told the police that O.B. fell off playground equipment. *Id.* at 40. She admitted she had lied to Officer Mongold during his investigation (*id.* at 46), but she later made calls to appellant at the detective's behest to lure appellant into making damaging statements. *Id.* at 47-48. She also admitted that she knew O.B. had been vomiting the night before his going to the hospital, and that she had lied to the doctors. *Id.* at 76, 81. We nonetheless note that the jury was made aware that Ruth's sentencing had been deferred and that she had agreed to testify truthfully against appellant, and she did not deny that she anticipated going to prison. *See* Tr. II at 16.

**{¶61}** As to the remaining adult witnesses, while the jury heard from other police witnesses and the testimony of Sis, Ruth's aunt, appellant urges their testimony was either factually inconsequential to establishing any element or duplicative procedural narrative (Officers Kalabon and Weller). For example, Sis stated decisively she never witnessed any child abuse. Tr. II at 98. She additionally stated she saw no injuries, and in fact informed the police nothing was wrong. *Id.* at 107-108. Sis also stated she never "really" heard fighting or screaming. *Id.* at 116. Officers Kalabon and Weller testified they responded to the home (Tr. I at 201) and collected items such as a belt (*id.* at 216), but beyond that never offered testimony as to appellant specifically.

**{¶62}** Finally, appellant points out a number of claimed weak points in the testimony of O.B.'s brothers. For example, R.B., the oldest brother, said at times he didn't see much because of his school schedule. Another brother, T.B., testified that they were

struck with the belt on the buttocks only, and on cross-examination he indicated had not actually seen O.B. being hit by appellant. Lastly, E.B. was unable to describe any boxing gloves, and he denied that the incidents of O.B. being held out the window involved more than the child's head and shoulders.

**{¶63}** However, upon full consideration of appellant's foregoing claims against the backdrop of the entire case, we do not conclude that this is the rare case in which the evidence "weighed heavily" against appellant's convictions. In particular, it is not surprising that appellant's sudden abusive presence in the lives of these child victims would have resulted in varying degrees of recollection by them on the witness stand. We hold the jury did not clearly lose its way and create a manifest miscarriage of justice requiring that appellant's convictions for murder and child endangering be reversed and a new trial ordered.

**{¶64}** Appellant's First Assignment of Error is overruled.

II.

**{¶65}** In his Second Assignment of Error, appellant contends the trial court erred in overruling his motion to exclude autopsy photographs of O.B. We disagree.

**{¶66}** As a general rule, all relevant evidence is admissible. Evid.R. 402; cf. Evid.R. 802. Our task is to look at the totality of the circumstances in the case *sub judice*, and determine whether the trial court acted unreasonably, arbitrarily, or unconscionably in allowing or excluding the disputed evidence. *State v. Oman,* 5th Dist. Stark No. 1999CA00027, 2000 WL 222190.

**{¶67}** Specifically, under Evid.R. 403 and Evid.R. 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Landrum* (1990), 53

Ohio St.3d 107, 559 N.E.2d 710. *See also State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768. Under Evid.R. 403(A), the probative value of the evidence must be weighed against the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 611(A) further provides, in relevant part, that the trial court "shall exercise reasonable control over the mode and order of ... presenting evidence so as ... to make the ... presentation effective for the ascertainment of the truth" and to "avoid needless consumption of time." The Ohio Supreme Court has recognized: "Although a photograph may be rendered inadmissible by its inflammatory nature, the mere fact that it is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury." *State v. Woodards* (1966), 6 Ohio St.2d 14, 25, 215 N.E.2d 568. "The real question is whether the probative value of such photographs is outweighed by the danger of prejudice to the defendant." *Woodards* at 25, 215 N.E.2d 568.

{¶68} The record in the case *sub judice* indicates that although the coroner had taken 137 autopsy photographs, the State only intended to introduce 24 of them. At the hearing conducted on the motion *in limine*, the court ruled out two photographs: an image of the child's resected bowel and one image of the child's penis. The remaining 22 photographs, which have been provided to this Court as exhibits from the trial record, include images of O.B.'s knocked-out tooth, bruising to his head and scalp, bruising to the child's body, left arm, right wrist, and right hand, and marks on his face. While the medical cause of the child's death was not in significant dispute, appellant maintained at trial that the mechanical cause of the fatal injury was a fall, and that the lesser injuries were caused by the child's play activities or the dog. The State thus had a necessity to

document the injuries via a reasonable number of photographs taken by the coroner. We therefore are unpersuaded upon review that the trial court committed plain error or abused its discretion in admitting the autopsy photographs at issue.[2]

**{¶69}** Appellant's Second Assignment of Error is therefore overruled.

III.

**{¶70}** In his Third Assignment of Error, appellant contends the trial court erred in failing to merge appellant's offenses for the count of murder of O.B. and the count of child endangering as to O.B. We disagree.

**{¶71}** R.C. 2941.25 states as follows:

(A)   Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B)  Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

---

[2]   We reference the plain error rule, as it appears appellant did not renew his objection to the admission of the photographs at the close of the State's evidence.  Tr. III at 105. But appellant did renew his objection during Kohler's testimony.  *See* Tr. III at 48. We note a denial of a motion *in limine* does not preserve error for review, and a proper objection must be raised at trial to preserve error. *See State v. Deckard*, 4th Dist. Gallia No. 16CA14, 2017-Ohio-8469, 100 N.E.3d 53, ¶ 22. However, we also note Evid.R. 103(A) now states in pertinent part: "Once the court rules definitely on the record, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."

**{¶72}** R.C. 2941.25 protects a criminal defendant's rights under the Double Jeopardy Clauses of the United States and Ohio Constitutions. *See State v. Jackson,* 2nd Dist. Montgomery No. 24430, 2012-Ohio-2335, ¶ 133. Appellate review of an allied offense question under R.C. 2941.25 is *de novo. State v. Williams,* 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 12.

**{¶73}** Under the Ohio Supreme Court's decision in *State v. Earley,* 145 Ohio St.3d 281, 285, 2015-Ohio-4615, 49 N.E.3d 266, we now apply a three-part test under R.C. 2941.25 to determine whether a defendant can be convicted of multiple offenses: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *Id.* at ¶ 12, citing *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. We also note in *Ruff,* the Court had further developed the analytical framework for courts to apply regarding the concept of "import," holding in part as follows: "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff,* at paragraph two of the syllabus.

**{¶74}** In a recent case likewise involving the murder of a child under R.C. 2903.02(B) and child endangering under R.C. 2919.22(B)(1) and/or (B)(2), we stated as follows: " *** [W]e find that the murder statute at issue in this matter is intended to punish the taking of a human life while engaging in violence against another, while the proscription against child endangering, in principle, is for the separate overall purpose of

protecting children against any type of abuse or torture, which, in this instance, resulted in serious physical harm and eventual death." *State v. Miku*, 5th Dist. Stark No. 2017 CA 00057, 2018-Ohio-1584, ¶ 79.

{¶75} Furthermore, in the case *sub judice*, the evidence demonstrated that O.B. suffered from a continuous course of conduct of child endangering by appellant over a more than three-month period, while the murder was more directly related to the blunt force trauma to the child's abdomen and sepsis from a perforated bowel. Under these circumstances, and pursuant to our rationale in *Miku*, we hold the trial court in the case *sub judice* did not err in refusing to merge these two offenses for sentencing.

{¶76} Appellant's Third Assignment of Error is therefore overruled.

{¶77} For the reasons stated in the foregoing, the decision of the Court of Common Pleas, Stark County, is hereby affirmed.

By: Wise, P. J.

Delaney, J., and

Baldwin, J., concur.

JWW/d 1012