[Cite as *State v. White*, 2021-Ohio-1644.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-190589 |
| | | TRIAL NO. B-1806227 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| HAROLD WHITE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, Sentences Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: May 12, 2021

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller,* Hamilton County Public Defender, and *Krista M. Gieske*, Assistant Public Defender, for Defendant-Appellant.

**BOCK, Judge.**

{¶1} A jury found defendant-appellant Harold White guilty of two counts of rape in violation of R.C. 2907.02(A)(1), abduction in violation of R.C. 2905.02(B), one count of third-degree-felony gross sexual imposition in violation of R.C. 2907.05(B), two counts of fourth-degree-felony gross sexual imposition in violation of R.C. 2907.05(A)(1), and 17 counts of endangering children in violation of R.C. 2919.22(B)(2). The trial court merged the abduction count with one of the rape counts and sentenced White to life imprisonment for each rape, 36 months for the third-degree-felony gross-sexual-imposition count, 18 months for each of the fourth-degree-felony gross-sexual-imposition counts, and 36 months for each of the endangering-children counts. The court later entered a nunc pro tunc order stating that White's sentences for rape were 15 years to life.

{¶2} White now appeals his convictions and sentences, arguing that (1) the trial court's multiple evidentiary errors deprived him of a fair trial; (2) the state's medical expert on child abuse improperly vouched for the veracity of the victims; (3) his convictions were unsupported by sufficient evidence and contrary to the weight of the evidence; (4) the 17 child-endangering convictions did not have juror unanimity; (5) cumulative error deprived him of a fair trial; and (6) his sentences were contrary to law. Having thoroughly reviewed the record, we conclude that part of his sentence was improper but affirm the trial court's judgment in all other respects.

## Factual History

{¶3} A.R. and K.R. are half-sisters who share a mother, Ashley. At the time of these offenses, A.R. was seven years old and K.R. was four years old. Ashley also has a child with White's stepson, Robert Hull ("Hull"). That child, R.H., was 18 months old at the time of the offenses.

2

{¶4} In 2013, Ashley was incarcerated. Because their maternal grandmother was unwilling to care for them, the girls moved into White's home at his insistence. White lived on the first floor of a two-family home in Silverton, Ohio with his then-wife Teresa. Teresa is Hull's mother. Hull and R.H. were staying with White and Teresa during this time because Hull was trying to overcome his drug addiction and was actively withdrawing from drugs. The girls lived in White's home for almost six months until their mother was released from prison. During that time, A.R. attended school during the day, Teresa worked outside of the home, and White and Hull stayed at home with K.R. and R.H.

### 1. A.R. testified that White abused both girls

{¶5} At trial, A.R., who was then 13-years old, testified that living with White was "horrific." She stated that as soon as she and K.R. were safely in the car with their mother and grandmother, she told them "that Harold hurt me and [K.R.] and, like abused us[.]" Her mother took the girls to Cincinnati Children's Hospital Medical Center ("CCHMC") three days later.

{¶6} A.R., who became emotional while testifying, recounted instances of White hitting the girls with open and closed fists as well as with "the strap or the buckle" of a belt. She testified that the belt left bruises "on my back, my face, my back thighs, and my back calves." When asked why she did not report this abuse to someone at school, she explained that she was afraid that they would call White and then he would hurt K.R. because she was at home with him during the day.

{¶7} She testified that White had given her, K.R., and R.H. alcohol—"wild Turkey and Captain something"—on more than one occasion. A.R. said White would "hold our head, and shoot [the alcohol] down our throat with a syringe." A.R. said the alcohol made her dizzy and caused K.R. to throw up.

3

{¶8} A.R. testified that more than once, when A.R. and K.R. were too loud, White would force them to stand naked in a military position with their legs separated and hands locked behind their heads. A.R. said they were forced to stand like this at night and if they moved out of position, White would spank their buttocks with his hand or the belt, forcing them to resume the military stance.

{¶9} A.R. testified that White made her and K.R. touch each other's naked bodies and threatened to hit them with the belt if they did not comply. A.R. first stated that White forced them to touch "arms and fingers" and then he instructed them to lick each other's "butt and vagina."

{¶10} According to A.R., one or two times, White made the girls undress and walk outside to a tree in the backyard. He would tie the girls to the tree with rope and duct-tape their mouths. A.R. identified a photograph of the tree in the yard and said that they had been tied to the back of the tree where no one passing by on the street could see them. She mentioned that it was "so cold" and the bark hurt her back. The girls were left in that position for up to an hour.

{¶11} A.R. testified that one time White called them animals and made them "eat [their dinner] like dogs" off the dirty floor. A.R. explained that they had to do it because she did not want her and K.R. "to get beat on by him." She also recalled instances where White spit in the girls' faces and he "told us to take it off our face and swallow it." And on more than one occasion, A.R. testified that White bit the girls' fingers and toes, leaving bite marks. A.R. explained that this would cause K.R.'s fingers and toes to bleed and A.R. would bandage them.

{¶12} White's house had outdoor steps that led down to the entrance of the basement. A.R. testified that on more than one occasion, White made her and K.R.

sit on the stairs in various stages of undress while Hull watched over them. A.R. said that it was snowing and cold out when the girls had to sit or stand on the stairs.

{¶13} A.R. also recounted a time when she saw White grab K.R.'s vagina when the girls where standing in the dining room. The act made K.R. cry and left a bruise.

{¶14} Finally, A.R. testified that there was a "little room" in a "big open area" of the basement where White would make K.R. and A.R. sit back-to-back on a stool, naked, in the dark. She said it was cold in the basement. One day, when A.R. and K.R. were playing in the living room, A.R. heard White tell K.R. " 'come here.' And then [he] took [K.R.] outside because I could hear the door shut. And then I ran to the dining room and I looked out the window and I saw them go down to the basement."

### 2. K.R. testified to physical and sexual abuse

{¶15} K.R., ten years old at the time of trial, testified that White treated her "badly" when she lived with him. She identified White and testified that she remembered him tying her to a tree with duct tape over her mouth. She remembered it being very cold but she recalled having clothes on. She agreed with A.R.'s testimony that she threw up after being forced to drink alcohol and she testified that White used to "whip" her on the rear end and forehead with "Mr. Buckle," her name for the belt White used. She also testified that White made them eat off the floor "like animals."

{¶16} While she did not deny this happening, K.R. testified that she did not remember White grabbing her vagina or making her and A.R. lick each other. She remembered being forced to stand by the wall all night but did not remember who made her do it or whether she was naked.

{¶17} K.R. testified that one day when she was talking to A.R., White grabbed her arm and took her to the basement. She said that White, in a metal cage in the basement, put his penis into her vagina and anus. She testified that she heard "grunts" from White while he raped her and that it ended when Hull "came yelling for Harold." K.R. testified White told her, "If you tell anyone about this, then I [will] kill all your family members." While putting her clothes back on, K.R. noticed black hairs on her body that she believed were White's.

{¶18} K.R. said that her mother picked her and A.R. up from White's house the day the rape happened but she did not tell her mother about that and instead told her about being forced to drink alcohol and being given cigarettes. K.R. said she first disclosed the rape only after she had moved in with her father in 2017. She testified that she first told Casey, her father's girlfriend, that White had raped her on the last day she lived with him.

{¶19} Finally, K.R. testified that she remembered having to spend a week in 2017 at CCHMC after she had tried to hurt herself at school. She told doctors at the hospital about the "bad things" that were done to her and A.R. when she lived with White. The state showed K.R. her statement she had written during a session with her therapist, Maria Lucking. Over White's objection, K.R. read the statement to the jury. The statement indicated that Hull and White were "mean" to her, that White had raped her, and that he had threatened to kill her family if she told anyone. It stated that she was ready to "fight back and for justice."

3. Hull and Teresa corroborated some of the girls' testimony

{¶20} Hull testified that he had moved in with his mother, Teresa, and White while he was battling a substance-abuse problem and that he had not wanted the girls to live with them, but White had insisted. He said the first few days with the

6

girls were calm but then White started hitting them, first with his hands and then the belt for failing to follow "any instruction he gave them to a T." For example, if K.R. messed up the recitation of "how now brown cow," he would strike her. Hull said he saw bruises on both of the girls' buttocks, backs, and legs. He said that White once gave A.R. a black eye and she had to stay home from school.

{¶21} Hull corroborated A.R.'s testimony that White made the girls stand in the military stance for punishment with just their underwear on and that he did see them naked sometimes. Once, he saw K.R. in the military stance with her underwear pulled to her ankles. Hull reported that the girls would have to stand like that for 15 minutes at a time, but this would be repeated all day. He testified that once the girls had to stand in the military stance from dinner until 2 a.m. Hull recalled that White had forced him to stand in the military stance when he was younger and "show his ass" as a form of punishment.

{¶22} Hull also testified he would often have to bandage K.R.'s fingers and toes after White had bitten them. He testified that White would make the girls stand in "the hole" in minimal clothing when it was cold outside. He said White forced him to do the same at times. Hull witnessed White making the girls' eat their dinners on the floor like animals, spitting in the girls' faces, and hitting K.R. in the vagina.

{¶23} Hull also heard White telling the girls to "touch each other inappropriately." For example, he heard White tell A.R. to put her finger in K.R's anus.

{¶24} Hull testified that if he tried to protect the girls White would hit him "hard" and would strike Teresa. He also testified that White had choked R.H. once when he would not fall asleep.

{¶25} Finally, Hull reported that when the girls left the house in December 2013, White made an unsolicited comment "that they were going to say, that he molested them or something like that." Hull testified that when the Silverton police contacted him in 2013, White had arranged for his attorney to accompany Hull to make a statement. Hull said he did not report White's abuse to the police at that time because he was afraid that White would hurt R.H., who still lived at White's house. Eventually, in May 2014, after Hull had moved back in with the girls' mother, he contacted the police to recant his earlier statement and report that he had witnessed White physically abuse the girls. Hull said he was not contacted again by police until 2018, after K.R. had disclosed the sexual abuse.

{¶26} Teresa, now divorced from White, also testified at trial. She corroborated Hull's testimony that White had insisted the girls come live at the house with them. She witnessed White force the girls to eat off plates on the dirty floor, give them alcohol through a syringe, which caused the girls to become intoxicated, and force them to stand in the "military stance," but only once with no clothes on. She testified that White would punish Hull in the same way when he was younger in order to "humili[ate]" him. Teresa said she could not confirm that White made the girls stand up all night, but she had seen them stand for up to an hour and sometimes late at night. She also reported that White spit in K.R.'s face when she had not recited a nursery rhyme correctly.

{¶27} Teresa reported that she came home from work on two occasions to find Hull outside in cold weather with minimal clothing on. The first time he was standing out in the cold with K.R. on the stairs, both with inappropriate clothing on for the weather. The second time, she told Hull to come inside, but he refused because he was scared of White.

8

**{¶28}**  Teresa testified that she tried to leave the house once to get the police but White had R.H. and told her he would "slice all their throats before she could get back." Over White's objection, Teresa testified that White would "smack or punch" her if she tried to protect the girls. She also recalled overhearing White tell Hull, prior to giving his statement to police in 2013, that if he "did not get the story right, they wouldn't be here when he got home." Finally, she testified that on the day Ashley came to pick up the girls, White called her at work and said, "this is where it all starts–the allegations of abuse * * * I will be accused of sexually molesting them, too."

### 4. Treatment providers testified about girls' reported abuse

**{¶29}**  Reagan Katzmiller, a social worker at CCHMC, met with A.R. and K.R. when their mother brought them to the emergency room in December 2013. She testified that A.R. reported to her that White had beat them, bit their fingers, used wrestling moves on them, made K.R. stand in "the hole" (later identified as the outside stairs to the basement), had grabbed K.R.'s vagina, slapped K.R. across the face with his penis, and had shown the girls pornographic pictures. K.R. reported to her that White had bit her, hit her in the face with the belt, and made her stand in the hole wearing only a shirt. Katzmiller testified that the children were referred to the Mayerson Center (a division of CCHMC that diagnoses and cares for children who have been victims of abuse and/or neglect) and that providers had performed a pediatric sexual-assault-nurse-examiner test ("SANE exam") on each child, which revealed no physical injury to the girls' genitalia.

**{¶30}**  Tracy Colliers, a social worker at the Mayerson Center, interviewed A.R. in December 2013. A video recording of that interview was admitted into evidence and played for the jury. In that interview, A.R. disclosed to Colliers that

White had taken a picture of K.R. with no clothes on, that she, K.R., and R.H. had been given alcohol, that White had hit her with a belt, his arms, and his hands, that White had smacked K.R. in her face with his penis, and that White had grabbed K.R.'s vagina with his hand. A.R. reported seeing bruises on K.R.'s vagina when they took a bath together later that day. She reported having to eat dinner off the floor "like a cat and dog" and, one time, having to lap soup out of a bowl. She said that her hair "got nasty and sticky." The Mayerson report, which was admitted into evidence, noted that the information obtained from A.R. was consistent with inappropriate sexual contact and concerning for abuse.

{¶31} Cecelia Freihofer, also a social worker at the Mayerson Center, interviewed K.R. in December 2013. The video recording of that interview was admitted into evidence and played for the jury. K.R. reported to Freihofer that she had been beaten by White, Teresa, and Hull. K.R. told Freihofer that White had hit her with a belt, had bitten her fingers and toes, had made her stand all night in a military stance, and had dunked her face in a toilet. Friehofer testified that she was concerned with K.R.'s matter-of-fact reporting, "[h]e beat me." Friehofer said, "That is concerning because getting beat should not be matter of fact."

{¶32} Freihofer also interviewed K.R. in August 2018 after K.R. had disclosed the rape to her father's girlfriend. Freihofer explained why children sometimes delay disclosing abuse and testified that it was "not unusual at all" for a child to delay reporting sexual abuse. She testified that certain factors in K.R.'s life in 2018 made her more inclined to disclose abuse: "She was not living with her dad [when the abuse happened]. She had a connection to the alleged perpetrator through her mom. Mom is staying with the alleged perpetrator's son. Now she is with her dad. She wasn't around [White] anymore and she was in therapy, had been for a

10

while and felt safe enough to tell." During the interview, K.R. was embarrassed to tell Freihofer what had happened so she drew a picture and wrote the words, "[White] had raped me. Rape means 'had sex with me.' He took my clothes off and his." K.R. stated that she remembers White's penis being "hairy." She reported finding a black hair in her underwear when she went to the bathroom. The video recording of the 2018 interview was admitted into evidence and played for the jury.

{¶33} Freihofer said that this interview was conducted for medical diagnosis and treatment purposes because this was the first allegation of sexual abuse. Following the interview, testing for sexually-transmitted diseases was recommended and performed by medical providers. Freihofer recommended continued mental-health therapy.

{¶34} Maria Lucking was K.R.'s therapist in 2017. She testified that K.R.'s father sent her to therapy when she began living with him because "[K.R.] had been abused by her mother's boyfriend's family." K.R. told Lucking that she had learned the word rape from listening to the news program that her grandmother, who lived with K.R. and her father, watched at night. Lucking testified that K.R. suffered from post-traumatic stress disorder. Her therapy notes were admitted into evidence. On cross-examination, Lucking testified that K.R. had said she liked living with her mother's family in Indiana but that the place was "unsafe" and that she had seen "porn" at her mother's family's house. Lucking reiterated that although K.R.'s childhood was difficult prior to living with White, the acts K.R. had experienced at White's home had caused her trauma.

{¶35} Dr. Robert Shapiro, a child-abuse pediatrician expert, testified that it was common or typical for children who had been sexually abused to show no physical signs of trauma. He had physically examined A.R. and K.R. in 2013 when

they presented at the emergency room. He testified that K.R. had injury to her nail and nailbed, but no injury to her genital area. He testified that he had diagnosed A.R. and K.R. with abuse. He based that diagnosis on the girls' medical records from CCHMC, the girls' interviews at the Mayerson Center, and his consultation with the social workers at the Mayerson Center. He also opined that the abuse that the girls had suffered would affect their physical and emotional/mental health long term.

### 5. Detective investigated abuse allegations

{¶36}   Based on the allegations of abuse made during the girls' 2013 CCHMC visit, the prosecutor presented charges to a grand jury, but the grand jury ignored those charges.

{¶37}   Detective Jared Ruther from the Hamilton County Sheriff's Office, who was not involved in the case in 2013, testified that the 2013 investigation had not been thorough. He stated that the police had not interviewed Teresa White and police had not searched the house to see if there was pornography present or if there was a "cage" in the basement.

{¶38}   But after K.R. disclosed the allegation of sexual abuse to her father's girlfriend, Ruther began a new investigation. He interviewed A.R. at the middle school she attended and started looking into the 2013 investigation.

{¶39}   Detective Ruther interviewed White in 2018 and described it as "odd." He noted that White was very nonchalant and White even said he had a feeling that he was going to be charged with "a felony one." During the interview, White confirmed that his attorney had accompanied Hull to the police station in 2013 because White thought the police investigators were "looking at him funny." White admitted to Ruther that he used the military stance as a form of punishment and that he had practiced nursery rhymes with K.R. On cross-examination, Detective Ruther

testified that he had viewed the home where the girls had lived in 2013 and saw a coal room in the basement. He believed the coal room is what K.R. was referring to when she mentioned a cage, even though it was not metal.

{¶40} At trial, the state went through each offense and connected what evidence the state believed supported them. During deliberations, the jury requested written documentation as to what acts were connected with each child-endangering charge. The trial court instructed the jury to rely on its collective memory.

{¶41} The jury returned guilty findings on all the charges.

### Assignments of Error

I. First Assignment of Error

{¶42} White contends that the trial court's commission of numerous evidentiary errors deprived him of a fair trial. While the trial court improperly admitted some other-acts evidence, White was not materially prejudiced.

{¶43} Generally, the admission of evidence lies with the broad discretion of the trial court and this court will not disturb an evidentiary decision in the absence of an abuse of discretion that has created a material prejudice. *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, 932 N.E.2d 313, ¶ 38.

*Other-acts evidence*

{¶44} White first argues that the court erred by allowing the state's witnesses "to testify to highly prejudicial other acts testimony without any limiting instruction" in violation of Evid.R. 404(B). Essentially, White argues that the trial court improperly admitted testimony involving his bad acts toward Hull, Teresa, and R.H., which significantly impacted the jury's decision finding him guilty of the charged offenses against K.R. and A.R.

**{¶45}** Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." As this court has explained: "Evid.R. 404(B) exists to guard against the 'propensity' inference—in other words, wielding past bad acts to prove action in conformity therewith, which facilitates a conviction based on prior conduct rather than the evidence at hand." *State v. O'Connell*, 2020-Ohio-1369, 153 N.E.3d 771, ¶ 1 (1st Dist.).

**{¶46}** However, Evid.R. 404(B) permits the admission of other acts for limited purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). "The key is that this evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

**{¶47}** The Ohio Supreme Court recently set forth a road map to assist courts in determining whether other-acts evidence shows propensity versus a legitimate purpose. *Id.* The first step is to determine whether the evidence is relevant to the particular purpose for which it is offered. *Id.* at ¶ 25, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20; Evid.R. 401(A). Second, the other-acts evidence must be offered for a legitimate purpose under Evid.R. 404(B) and not to show propensity to criminal conduct. *Hartman* at ¶ 22-25. These first two steps pose legal questions that we review de novo. *Id.* at 22; *State v. McDaniel*, 1st Dist. Hamilton No. C-190476, 2021-Ohio-724, ¶ 17.

**{¶48}** After determining that the evidence is relevant to show a permitted, nonpropensity purpose, the trial court must conduct the balancing test laid out in Evid.R. 403. *Hartman* at ¶ 29. If the probative value of the evidence is "substantially

14

outweighed by the danger of unfair prejudice, the court must exclude it. This balancing is reviewed for an abuse of discretion." *Id.* at ¶ 30.

{**¶49**} The state notes that White only objected to some of the other-acts evidence admitted at trial. White argues that he had a continuing objection lodged as to the admission of other-acts evidence. Although White had filed a motion in limine to exclude other-acts evidence, the court indicated, prior to trial, that it would address that evidence as it occurred at trial. Thus, White was to bring other-acts evidence to the attention of the trial court through an objection.

{**¶50**} Turning to the evidence to which White objected, we note that if it was error for the court to admit that evidence, then we must still measure that error against the harmless-error standard. *McDaniel* at ¶ 23. Under the harmless-error standard, the state must demonstrate that the error did not affect the substantial rights of the defendant; that is, the error did not affect the outcome of the trial. *State v. Hayes*, 2020-Ohio-5322, 162 N.E.3d 947, ¶ 51 (1st Dist.).

{**¶51**} White argues that Hull's testimony—that White made him stand in "the hole" and that White had disciplined a younger Hull using the military stance with Hull's buttocks exposed—was improper other-acts evidence. The state concedes this was error, but argues that it was harmless in light of the overwhelming permissible evidence at trial that demonstrated that White had made A.R. and K.R. stand outside in "the hole" and stand in the military stance in various states of dress. We agree.

{**¶52**} Both girls testified about White's offenses against them and reported those offenses to the social workers in the emergency department at CCHMC and the Mayerson Center. K.R. disclosed the abuse to her therapist, Maria Lucking. Hull and White provided eyewitness testimony to many of the offenses. And White himself

admitted to Detective Ruther that he utilized the "military stance" as a form of discipline.

{¶53} Next, White argues that Teresa's testimony—that White struck Hull and that White abused Teresa—was improper other-acts evidence. The state argues that this other-acts evidence was permissible to show the "setting" of the case and to explain why Teresa and Hull failed to intervene on the girls' behalf. But even if we presume that this evidence was impermissible other-acts testimony, we find, again, that it was harmless in light of the overwhelming permissible evidence presented at trial. *See State v. Byran*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 127. Teresa and Hull provided eyewitness corroboration to many of the offenses against the girls.

{¶54} White failed to lodge an objection against the remaining evidence he now contests. Therefore, he has waived all but plain error. *See State v. Hessler*, 90 Ohio St.3d 108, 121, 734 N.E.2d 1237 (2000); Crim.R. 52(B). To demonstrate that the trial court committed plain error, White must show that (1) an error occurred, (2) the error was obvious, and (3) it affected the outcome of the trial. *Hayes*, 2020-Ohio-5322, 162 N.E.3d 947, at ¶ 41.

{¶55} White maintains that A.R.'s testimony that White gave R.H. alcohol, Hull's testimony that White choked R.H. when he would not fall asleep, and Teresa's testimony that White tried to choke Hull during an argument were impermissible other-acts evidence. Even if we presume error, we find that White has failed to demonstrate how he was prejudiced by that testimony. If we remove that testimony and consider the evidence that remained, it amply supports White's convictions. A.R. testified at trial and reported to the social workers in 2013 that White gave the girls alcohol through a syringe. She even named the type of alcohol. Hull and Teresa

16

corroborated this testimony. Both K.R. and A.R. testified at trial and reported to the social workers in 2013 that White hit them with the strap and the buckle of his belt and left bruises. K.R. even had a name for the belt—Mr. Buckle.

{¶56} We caution the state that it pushed the limit with the other-acts evidence it presented; however, we simply cannot find that any error by the court in admitting this evidence affected the outcome of White's trial given the overwhelming permissible evidence of his guilt.

{¶57} White also argues that the trial court was required to give a limiting instruction regardless of whether he had asked for one. We disagree. As the Ohio Supreme Court has noted, "[T]he decision not to request a limiting instruction is sometimes a tactical one, and we do not wish to impose a duty on the trial courts to read this instruction when it is not requested." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 67, citing *State v. Schaim,* 65 Ohio St.3d 51, 61, 600 N.E.2d 661 (1992). Therefore, we find that the trial court's lack of limiting instructions was not error.

*Witnesses reading from pretrial statements*

{¶58} White contends that the trial court erred when it permitted A.R. to read from a statement that she had given to Detective Ruther in 2018 and when it permitted K.R. to read a statement that she had written during therapy.

{¶59} With respect to A.R.'s statement, we note that after White had objected to the admission of A.R.'s statement to Detective Ruther, White questioned A.R. about the statement on cross-examination. The questioning implied that A.R.'s testimony at trial was inconsistent with what she had reported to Detective Ruther in 2018. For example, defense counsel asked A.R. if she remembered Detective Ruther asking her whether she had seen White do anything to K.R. After A.R. testified that

17

she did remember telling him that White had touched K.R., defense counsel said, "Okay. Would you be surprised that you told him you never saw [White] do anything to [K.R.]?"

{¶60} White did not object when the state asked A.R. to read from her statement on redirect. But while A.R. was reading the statement aloud, White objected; A.R. did not read anything further. Because there was no objection to the portion that was read, we review for plain error. Crim.R. 52(B). Our review of the record demonstrates that White has not shown plain error. Defense counsel was trying to impeach A.R.'s testimony by using her statement to Detective Ruther. As such, the state was then permitted to introduce the entire statement into the record, but it did not do so. *Shellock v. Klempay Bros.*, 167 Ohio St. 279, 148 N.E.2d 57 (1958), paragraph two of the syllabus. Only a few lines were read into the record. Given that White had the ability to cross-examine both A.R. and Detective Ruther on the statement A.R. gave to him in 2018, we find that White failed to demonstrate that the admission of those few lines of her statement was plain error.

{¶61} Next, White argues it was error for the court to permit K.R. to read a statement she had previously drafted during a therapy session. As K.R.'s statement was being used by the state to refresh K.R.'s recollection, White is correct that under *State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369 (1996), a memorandum used to refresh a witness's recollection may not be admitted into evidence or read into the record. However, we hold that K.R.'s reading of her statement was harmless, as this statement was contained in K.R.'s medical records, which were properly admitted into evidence under the hearsay exception for statements made for medical diagnosis and treatment. *See* Evid.R. 803(4).

*Detective Ruther's testimony*

{¶62} White, citing Evid.R. 602, contends the trial court erred by allowing Detective Ruther to testify about the results of SANE exams and the collection and testing of forensic evidence. Evid.R. 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

{¶63} At trial, Detective Ruther testified that many pediatric SANE exams do not reveal physical evidence and gave reasons as to why that may occur. White objected to this testimony, arguing that Ruther had not been qualified as an expert to testify about SANE exams or forensic testing. The trial court stated that Detective Ruther was not testifying as an expert. Given that Detective Ruther had investigated more than 200 child-sex-abuse cases, we conclude that Ruther was testifying about his own experience, and therefore, this evidence was properly admitted.

{¶64} Next, White contends that Detective Ruther testified about why trained forensic examiners did not test the hair found in K.R.'s underwear when she presented to the emergency room in 2013. But Detective Ruther was not testifying as to why the coroner's office did not test the hair in 2013. Rather, he said that if he had been in charge of the investigation he would not have had the hair tested because even if it had been White's hair, it could have been explained away by the fact that White and K.R. had lived together and the hair had transferred in the laundry.

{¶65} The trial court properly permitted Detective Ruther's testimony.

*Admission of 2018 Mayerson Center interview was proper*

{¶66} Finally, White argues that the admission of K.R.'s 2018 Mayerson Center interview was error. We disagree.

19

{¶67} Evid.R. 803(4) permits the introduction of statements made for purposes of medical diagnosis or treatment. The 2018 Mayerson Center interview occurred shortly after K.R. had disclosed allegations of sexual abuse.

{¶68} White argues that this interview was primarily for investigative purposes instead of for medical diagnosis or treatment, pointing out that K.R. was already receiving psychological treatment.

{¶69} Freihofer testified that the interview was for medical-diagnosis and treatment purposes. Indeed, because of the new sexual-abuse allegations, she recommended that K.R. be tested for sexually-transmitted diseases and continue in mental-health therapy.

{¶70} Because we find that the 2018 Mayerson Center interview was for medical diagnosis and treatment, it was properly admitted into evidence under Evid.R. 803(4).

{¶71} The trial court's limited evidentiary errors were harmless or did not amount to plain error. Therefore, we overrule the first assignment of error.

II. Second Assignment of Error

{¶72} In his second assignment of error, White contends that the trial court erred by allowing Dr. Shapiro, the state's expert in child-abuse pediatrics, to opine that A.R. and K.R. were most likely abused based solely on A.R.'s disclosures. Because White did not object to Dr. Shapiro's opinion that the girls had been abused while living with White, he has waived all but plain error. *See State v. Lundgren*, 73 Ohio St.3d 474, 653 N.E.2d 304 (1995); Crim.R. 52(B).

{¶73} In *State v. Boston*, 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989), the Ohio Supreme Court held that "an expert's opinion testimony on whether there was sexual abuse would aid jurors in making their decision," and is thus admissible

under Evid.R. 702 and 704. However, the court held that an expert may not testify as to the veracity of the child-victim's statements. In *Boston*, the expert's statement that the child-victim was not "falsifying" or "fantasizing" was found to be improper and should have been excluded. White argues that Dr. Shapiro based his opinion that the children had been abused solely on A.R.'s disclosures in 2013, and therefore, he was impermissibly vouching for A.R.'s truthfulness. But the record does not reflect that Dr. Shapiro relied solely on A.R.'s disclosures to support his finding that the girls had suffered abuse. Dr. Shapiro testified that he had reviewed both girls' statements given to social workers at the Mayerson Center, the emergency-department medical records, and the Mayerson Center medical records. He also testified that he had conferred with the social workers who had interviewed the children in 2013 and had conducted his own physical exam of each child in 2013.

{¶74} Next, White argues that Dr. Shapiro's testimony about Mayerson Center interviews—that employees are mindful of the possibility of coached disclosures and look for details that would be difficult for a child to fabricate— effectively vouched for A.R.'s veracity. We disagree. Dr. Shapiro provided this testimony in response to questions about how the Mayerson Center conducts its interviews.

{¶75} Based on the foregoing, we hold that the admission of Dr. Shapiro's testimony does not amount to plain error. The second assignment of error is overruled.

III. Third Assignment of Error

{¶76} White's third assignment of error contests the sufficiency and weight of the evidence underlying his convictions. We review challenges to the sufficiency of the evidence by viewing the evidence in the light most favorable to the state and

determining "whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt." *State v. Barnthouse*, 1st Dist. Hamilton No. C-180286, 2019-Ohio-5209, ¶ 6. With respect to the weight of the evidence, this court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created a manifest injustice in finding the defendant guilty. *Id.*

## Rape and Abduction Offenses

{¶77} With respect to the two offenses of rape and abduction, White does not dispute that there was sufficient evidence to support these crimes, but maintains that the evidence offered by the state to support the crimes was simply not credible. He maintains that K.R.'s statements of rape and abduction are the result of "bitter family resentments that coalesced into a plan to put [White] in prison for the rest of his natural life." We find no merit to this argument. There is no evidence in the record that K.R.'s maternal relatives or K.R.'s biological father convinced K.R. to accuse White of rape.

{¶78} White maintains the following facts show that K.R.'s allegations are not credible: (1) K.R.'s disclosure of sexual abuse was made abruptly; (2) K.R. testified that there had been a black, metal cage in the basement, but the record reveals that it was really a wooden "coal room" in the basement; (3) there was no physical evidence to corroborate the rapes even though a SANE exam was performed within 72 hours; and (4) ten-year-old K.R. did not use age appropriate language at trial.

{¶79} White's arguments were all countered at trial. Friehofer and Dr. Shapiro both testified that disclosures of abuse are commonly made over time and

usually when a child feels safe to do so. The evidence demonstrated that K.R. may have felt safe to disclose the sexual abuse given she was no longer living with anyone associated with White.

**{¶80}** K.R. testified that she was raped in a metal cage in White's basement. But it is not unreasonable for the jury to believe that a four-year-old child would recall a coal room in a basement as a cage.

**{¶81}** There was no physical evidence during her 2013 examination that K.R. had been raped. But Dr. Shapiro testified that often there was no physical evidence in child-sex-abuse cases. He mentioned that children heal quickly and that only slight penetration constitutes rape.

**{¶82}** Finally, despite White's assertion that K.R.'s language was too advanced, it is not unreasonable for a jury to believe that ten-year-old K.R. was mature enough to know these terms. Further, K.R. explained at trial that she learned the word rape from overhearing the news program her grandmother watches in the evening.

**{¶83}** The jury also had the opportunity to view K.R.'s demeanor during her trial testimony as well as during her 2018 videotaped interview at the Mayerson Center when she disclosed the rape to the social worker. And A.R. corroborated the abduction charge with her testimony that White took K.R. to the basement.

**{¶84}** Based on the foregoing, we cannot say that the jury lost its way in finding White guilty of these offenses.

*GSI offenses*

**{¶85}** White argues that all three gross-sexual-imposition offenses ("GSI") are based on A.R.'s testimony. White challenges her credibility.

23

**{¶86}** The fourth-degree GSI offense was based on White grabbing K.R.'s vagina and bruising it. Given A.R.'s consistent testimony about this act—she reported it in 2013 and in 2018—the jury did not create a manifest miscarriage of justice in finding White guilty of this count.

**{¶87}** The third-degree GSI offenses were based on White making K.R. and A.R. touch and lick each other's genital areas. White denies this happened and points out that it took the state asking several questions before A.R. disclosed what had happened. A.R. initially stated that both girls were naked and White made them touch fingers and arms. She eventually testified that White had forced them to "lick the butt and vagina." That A.R. began recounting this event by saying that White forced the girls to touch each other's fingers and arms before discussing having to touch each other's genital areas does not indicate that A.R.'s testimony was not credible, especially given how embarrassing it may have been for A.R. to recount this event in front of a room full of strangers.

**{¶88}** Finally, Teresa and Hull testified that White, unsolicited, had told both of them that he was going to be accused of sexually molesting the girls, thus lending credibility to A.R.'s testimony.

**{¶89}** The jury was in the best position to view A.R.'s demeanor and given the testimony of Teresa and Hull, we cannot say that the jury lost its way in finding White guilty of these three offenses.

*Seventeen counts of child endangering*

**{¶90}** White was charged with 17 counts of child endangering over a six-month period in which the girls lived with him. White asserts that because there was testimony of multiple acts at trial, it was unclear as to what acts constituted child endangering.

**{¶91}** Although witnesses testified about many acts, the state connected specific acts with each of the 17 counts. The state wrote the acts associated with each count on large white poster paper and gave defense counsel this information in type-written form.

Counts 7 and 8: White forced both girls to stand in the "hole" with inappropriate clothing;

Counts 9 and 10: White tied both girls to the tree with duct tape over their mouths;

Counts 11 and 12: White made the girls stand in the military stance with or without clothes on for long periods of time as punishment;

Counts 13 and 14: White forced both girls to eat off the floor;

Counts 15 and 16: White bit the girls' fingers or toes;

Counts 17 and 18: White hit both girls with the strap and buckle of a belt;

Count 19: White spit on A.R. and made her wipe his spit off her face and swallow it;

Counts 20 and 21: White made the girls stand in the military position during night time hours; and

Counts 22 and 23: White made the girls ingest alcohol, causing A.R. to feel dizzy and K.R. to vomit.

**{¶92}** White challenges the sufficiency of the evidence underlying these 17 counts. R.C. 2919.22(B)(2) prohibits torture or cruel abuse of a person under 18 years old. "Torture" and "cruel abuse" have been defined by case law. *See State v.*

*Corcoran*, 1st Dist. Hamilton No. C-260627, 2017-Ohio-7084, ¶ 14. "Torture" as used in the child-endangering statute means " 'the infliction of severe pain or suffering (of body or mind)[.]' " *State v. Wainscott*, 12th Dist. Butler No. CA2015-07-056, 2016-Ohio-1153, ¶ 24, quoting *State v. Surles*, 9th Dist. Summit No. 23345, 2007-Ohio-6050, ¶ 5. "Abuse" means " 'ill-use, maltreat; to injure, wrong or hurt.' " *Wainscott* at ¶ 24, quoting *Surles* at ¶ 5. "Cruelly" means to " 'demonstrate indifference to * * * another's suffering,' " or to treat " 'severely, rigorously, or sharply.' " *Wainscott* at ¶ 24, quoting *State v. Brown*, 9th Dist. Summit No. 23737, 2008-Ohio-2956, ¶ 12.

{¶93} White maintains that the act underlying each offense, if presumed true, does not constitute torture or cruel abuse. We disagree.

{¶94} The evidence could lead a rational juror to conclude that the acts testified to—forcing a child to stand outside in the cold with little clothing; tying a child to a tree with little clothing in cold weather and placing duct tape over her mouth; whipping a child with the strap and buckle of a belt hard enough to leave bruises; forcing a child to stand in a military stance with underwear pulled down for significant periods of time; requiring children to eat their food off of a dirty floor like animals; biting a child's fingers or toes hard enough to draw blood; spitting in a child's face and forcing her to wipe it off and swallow it; and forcing young children to ingest alcohol to the point of becoming sick—constitutes indifference to the maltreatment of a child or infliction of suffering of the body or mind.

{¶95} Although White raises several arguments regarding the credibility of the testimony at trial, we are mindful that the jury was able to observe the witnesses' demeanor and was in the best position to judge their credibility. Therefore, we cannot conclude, based on this record, that the jury lost its way in finding White guilty of the 17 counts of child endangering.

{¶96}  The third assignment of error is overruled.

IV. Fourth Assignment of Error

{¶97}  White maintains that he was deprived of his due-process rights and a unanimous jury verdict on the child-endangering charges. To support his argument, he points to the state's presentation of a "hodgepodge" of allegations during the trial, the 17 identically charged child-endangering counts in the indictment, and the jury's request during deliberations to have written documentation of which acts supported each count of child endangering.

{¶98}  White argues this is a "multiples acts" case under *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 37. *Gardner* involved juror unanimity and made a distinction between alternate-means cases and multiple-acts cases. In alternative-means cases, an offense may be committed in more than one way and jury unanimity is required for the crime itself, but not the means by which it was committed. *Id.* at ¶ 49. In multiple-acts cases, several different acts can constitute the charged crime and jury unanimity is required as to which act or incident supports each crime. *Id.* at ¶ 50. To ensure unanimity, the state must specify the particular criminal act upon which it relies for conviction. *Id.*

{¶99}  We find no merit to White's theory that the jury's findings of guilt on each count were not unanimous. The state connected specific acts with each count in the bill of particulars and wrote them on large white poster paper at trial for the jury. After the jurors requested written documentation of which act supported which count, the trial court told the jurors to rely on their collective memories. There is nothing in the record to indicate that the jury did not do that or did not reach a unanimous verdict on each count. Accordingly, the fourth assignment of error is overruled.

27

V. Fifth Assignment of Error

{¶100} White's fifth assignment asserts that he was deprived of a fair trial due to cumulative error. "Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-error does not individually constitute cause for reversal." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 321. Here, there were not numerous errors—only a few. And we determined that those evidentiary errors did not materially prejudice White. White's fifth assignment of error is overruled.

VI. Sixth Assignment of Error

{¶101} In his final assignment, White contends that his sentences are contrary to law. We agree in part.

{¶102} White first argues that his sentences should be concurrent, rather than consecutive. We disagree. The court made the required findings for consecutive sentences, which are supported in the record. *See* R.C. 2929.14(C)(4); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. Although White contends that his sentences were not the product of meaningful review of the sentencing factors, "this court has consistently held that R.C. 2929.11 and 2929.12 are not fact-finding statutes, and that, in the absence of an affirmative demonstration by the defendant to the contrary, we may presume that the trial court considered them." *State v. Jackson*, 1st Dist. Hamilton No. C-180341, 2019-Ohio-2027, ¶ 15. White has made no such demonstration.

{¶103} Next, White argues that his sentences constitute cruel and unusual punishment. But his sentences fell within the statutory ranges. Moreover, they were not "so greatly disproportionate to the offense as to shock the sense of justice in the

28

community." *See State v. Worlu*, 1st Dist. Hamilton No. C-180689, 2020-Ohio-1469, ¶ 14. White's sentences do not amount to cruel and unusual punishment. *Id.*

{**¶104**} For the sentences for rape, because K.R. was under the age of ten and there was no finding of force, the trial court had the option of sentencing White to a definite sentence of life in prison without parole under R.C. 2907.02(B) or an indefinite sentence of 15 years to life in prison under R.C. 2971.03(B)(1)(b). *See State v. Bowers*, Slip Opinion No. 2020-Ohio-5167, ¶ 3, citing *State v. Bowers*, 1st Dist. Hamilton No. C-150024, 2016-Ohio-904, ¶ 39. Here, the trial court announced a sentence of life imprisonment for each rape count and journalized an entry reflecting its announcement. But a few months later, the trial court entered a nunc pro tunc entry amending the sentence for each rape count to 15 years to life in prison.

{**¶105**} The trial court cannot effect such a change through a nunc pro tunc entry. "[N]unc pro tunc entries are limited in proper use to reflecting what the court actually decided, not what the court might or should have decided or what the court intended to decide." *State ex rel. Fogle v. Steiner*, 74 Ohio St.3d 158, 164, 656 N.E.2d 1288 (1995); Crim.R. 36.

{**¶106**} Therefore, the sentence for each rape count is vacated and this cause is remanded to the trial court to impose a sentence on each count consistent with this opinion.

{**¶107**} Next, White points out that the original judgment entry calculated White's aggregate sentence as two life sentences plus 684 months in prison. But the nunc pro tunc entry issued two months later amended the calculation to 87 years to two life sentences plus 57 years in prison. We agree with White that this calculation effectively doubles the sentences for all counts except the rape offenses. The trial court must correct this on remand.

29

**{¶108}** White also notes that while the trial court agreed he was entitled to 321 days of jail-time credit, that credit was not included in the sentencing entry. This too was error. *See State v. Craig*, 1st Dist. Hamilton No. C-160816, 2020-Ohio-3103, ¶ 37. On remand, the trial court is instructed to calculate White's jail-time credit and include it in the sentencing entry.

**{¶109}** Finally, the sentencing entry indicates that White's parole eligibility for the rape offenses is governed by R.C. 2967.13(A)(1). That statute, however, governs parole eligibility for murder and the entry must be corrected on remand.

**{¶110}** The fifth assignment of error is sustained in part and overruled in part.

## Conclusion

**{¶111}** Because the sentences imposed for rape were improper, we vacate those sentences. This cause is remanded to the trial court to (1) impose a sentence for each rape offense consistent with this opinion and the law; (2) calculate jail-time credit and include it in the sentencing entry; (3) recalculate the aggregate sentence; and (4) include the proper parole statute governing rape. We affirm the court's judgment in all other respects.

> Judgment affirmed in part, reversed in part, sentences vacated in part and cause remanded.

**ZAYAS, P.J.,** and **BERGERON, J.,** concur.

Please note:
The court has recorded its own entry on the date of the release of this opinion.