[Cite as *State v. Durbin*, 2025-Ohio-5724.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-250063 |
| | | TRIAL NO. B-2400490-B |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| TRAVIS DURBIN, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 12/23/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Durbin*, 2025-Ohio-5724.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-250063 |
| | | TRIAL NO. | B-2400490-B |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| | | *O P I N I O N* | |
| TRAVIS DURBIN, | : | | |
| Defendant-Appellant. | : | | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 23, 2025


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Bryan R. Perkins*, for Defendant-Appellant.

**CROUSE, Judge.**

**{¶1}** Defendant-appellant Travis Durbin appeals from the trial court's judgment convicting him, following a jury trial, of the felonious assault of N.H. in violation of R.C. 2903.11(A)(1) and sentencing him to an indefinite term of five years to seven years and six months of imprisonment.

**{¶2}** In four assignments of error, Durbin argues that the trial court erred by admitting prohibited other-bad-act evidence and a video recording of his arrest, and that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Finding these arguments to be without merit, we affirm the trial court's judgment.

## I. Factual and Procedural History

**{¶3}** On January 24, 2024, N.H. was released from the Hamilton County Justice Center. She accepted a ride home from someone who was picking up another inmate who had been released at the same time as she was. She ended up getting robbed, dragged by the vehicle during a struggle over her purse, and then run over and severely injured.

**{¶4}** Following an investigation by the Cincinnati Police Department, it was determined that Kyle Boreing was the inmate released with N.H. and that Durbin was the individual who had picked up N.H. and Boreing from the Justice Center. Durbin and Boreing were charged with aggravated robbery in violation of R.C. 2911.01(A)(3), robbery in violation of R.C. 2911.02(A)(3), felonious assault in violation of R.C. 2903.11(A)(1), and felonious assault in violation of R.C. 2903.11(A)(2).

**{¶5}** At the jury trial, N.H. testified that after she was released from the Justice Center at approximately 3:30 a.m. on January 24, 2024, she obtained cash from an ATM in the Justice Center and called her cousin for a ride home. N.H.

3

explained that her cousin was working at the time and could not pick her up for several hours, so she waited on a bench in the lobby of the Justice Center rather than walk home because it was the middle of the night and she was five months pregnant. She sat next to an individual, whom she later learned was Kyle Boreing, who had been released at the same time as her.

{¶6} N.H. testified that Boreing offered to have his ride, Durbin, drive her home. She stated that Durbin arrived at the Justice Center in a passenger van to pick them up. N.H. sat in the front seat, while Boreing sat in the back. N.H. testified that she stayed on the phone with her cousin the entire ride. During N.H.'s testimony, video recordings from cameras both inside the Justice Center lobby and outside of the building were played for the jury. These recordings showed N.H. and Boreing waiting in the lobby and outside of the building and then entering Durbin's van.

{¶7} According to N.H., the drive was uneventful, and once they arrived at her destination in the Pendleton neighborhood of Cincinnati, she thanked Durbin for the ride and started to exit the van. As she did so, Boreing put his arm over her shoulder and grabbed her purse. N.H. struggled with Boreing, who had moved to the front passenger seat. Still holding onto her purse, N.H. was able to get out of the van. At that point, N.H. felt the van begin to move again, and it dragged her down the street while she clung to her purse. N.H. testified that she screamed for help as the van began to move. She stated that her body hit other parked cars as she was dragged and explained, "[M]y whole, like, legs and knees, and everything, was, like, being scraped and hit by the car that was parked." N.H. was forced to let go of the purse when the van turned into a parking lot. N.H. testified that Durbin drove the van, but that he never touched her.

{¶8} N.H. stated that after she hit the ground, she stood up and saw the van

4

turn around in the parking lot. It drove towards the lot's exit, where N.H. stood. N.H. testified that the van ran her over, and that she called 9-1-1 as she lay on the ground in pain, unable to move or to feel her legs and arm. During the call, a recording of which was admitted and played at trial, a hysterical N.H. told the operator that she had just been robbed and repeatedly stated, "[T]hey ran me over." N.H. told the operator that she was attacked by two white males and that they were in a white van. She stated that she was in pain and that she was having difficulty breathing, and she expressed concern for her unborn child. N.H. testified that she later was able to identify Durbin in a photographic lineup.

{¶9} N.H. testified that she was transported to a hospital where she remained for several days. She suffered bruised ribs, a punctured heart, and scrapes and bruises on her legs and elbows. She further stated that she never recovered her purse, which contained $200, her keys, identification, and insurance card.

{¶10} The State presented testimony from Halee Yates, N.H.'s cousin who had planned to pick her up from the Justice Center and with whom N.H. was on the phone when this incident occurred. Yates stated that after she heard N.H. tell the vehicle's occupants to have a good night, she heard screaming. Yates immediately called 9-1-1, and, because she and N.H. shared their phone locations with each other, Yates was able to provide the operator with N.H.'s location.

{¶11} Kaylee Gardner, an eyewitness to these events, testified that she took her dog out for a walk at approximately 3:00 a.m. on January 24, 2024. Gardner heard tires squealing behind her and "the worst bloodcurdling scream [she] had ever heard." Gardner immediately hid behind a tree. She saw a "rusty" white van drive by. Gardner testified that a screaming girl was hanging out of the van as another person held onto her. She stated that the van dragged the girl's body down the street, did "donuts" in a

parking lot, and ran over the girl after she eventually let go. Gardner called 9-1-1. A recording of her call, in which she stated that she witnessed a van drag a woman down the street and then run her over, was admitted and played in court.

{¶12} Several law enforcement officers testified about their investigation of the offenses committed against N.H. Cincinnati Police Officer Kisha Williams testified that she responded to an emergency call on January 24, 2024, stating that a woman had been dragged by a car. When Officer Williams arrived at the scene, emergency responders were treating the victim, who was subsequently transported to the hospital. Officer Williams's body worn camera ("BWC") footage of the scene was admitted and played for the jury.

{¶13} Jannytta Oliver, an investigator with the Cincinnati Police Department, and Dan Kreider, a detective in the same department, testified that they each administered a separate photographic lineup to N.H. Their testimony established that N.H. identified Durbin in the lineup administrated by Investigator Oliver and Boreing in the lineup administered by Detective Kreider. Investigator Oliver testified that N.H. said that she was "100 percent" certain of Durbin's identification.

{¶14} Detective Kreider testified that after determining that Boreing was the inmate released from the Justice Center with N.H., he listened to Boreing's recorded jail telephone calls. From those calls, he obtained Durbin's phone number and called Durbin to inquire about Boreing's whereabouts. Durbin told Detective Kreider that he had picked up Boreing from the White Castle on Central Parkway and that he believed Boreing was at home.

{¶15} Detective Kreider testified that he called Durbin again after obtaining and reviewing pertinent video surveillance footage. He testified that Durbin insisted that he had picked up Boreing from the White Castle on Central Parkway. After the

detective told Durbin that he knew that he had picked up N.H. and Boreing from the Justice Center, Durbin became angry and told the detective to "suck his dick." Detective Kreider further testified that his investigation revealed no evidence that either Durbin or Boreing were at White Castle the night of the offenses committed against N.H., and that no other white vans were in the area during the period in question.

{¶16} During his investigation, Detective Kreider learned that Durbin worked for Trifecta Flooring and, in that role, drove a white van. He obtained video footage of Durbin and Boreing returning the van to their employer on January 24, 2024.

{¶17} Detective Kreider testified that, after a warrant was issued for Durbin's arrest, he spoke to Durbin's mother. Because she expressed concern that Durbin was unwilling to be taken alive, Detective Kreider contacted the Fugitive Apprehension Team to locate Durbin.

{¶18} Detective Kreider's testimony also addressed events that occurred after Durbin's arrest. He testified that he occasionally listened to Durbin's recorded jail telephone calls. Over Durbin's objection, some of these calls were admitted and played for the jury. In several of the calls, Durbin denied any involvement in the offenses committed against N.H. In one, Durbin stated to his mother, "This was why I should have went." Detective Kreider testified that he believed Durbin meant that he should have fled the jurisdiction.

{¶19} Detective Kreider explained that Boreing had reached out and expressed a willingness to talk about these offenses. After speaking with Boreing, he had no objection to Boreing receiving a reduced bond because he was concerned about Boreing's safety if he were to remain in jail.

{¶20} Cincinnati Police Investigator Craig Ball testified that he assisted

7

Detective Kreider with the investigation of this case. He explained that he obtained video footage from Justice Center cameras showing N.H. leaving the building with Boreing, as well as footage from various cameras throughout downtown Cincinnati and the Pendleton area depicting the travel of the white van that picked up N.H. and Boreing. This footage was admitted and played for the jury.

{¶21} Cincinnati Police Officer Mark Price testified that he worked in the office's Realtime Crime Center, where he monitored and reviewed cameras throughout the city and analyzed cellular data. Officer Price testified that Detective Kreider asked him to analyze data for Durbin's phone number. After doing so, he determined that Durbin was in the area of the Justice Center and the Pendleton neighborhood of Cincinnati at the time that the 9-1-1 calls regarding the attack on N.H. were placed. Officer Price further determined that Durbin subsequently drove through downtown before driving North on Interstate 75. He prepared a report of his findings, which included an interactive map that tracked Durbin's travel throughout downtown at and around the time of the offenses.

{¶22} Officer Charles Knapp testified that he served in the Cincinnati Police Department's Fugitive Apprehension Unit and that he had arrested Durbin on February 1, 2024, at a hotel on Colerain Avenue. Footage of the arrest from Officer Knapp's BWC was admitted and played in court. Officer Knapp explained that portions of the video were blurred because "[s]ome of the people in my unit are plainclothes and undercover officers that need to kind of remain anonymous so that they can utilize confidential informants out in the field while we look for these bad guys."

{¶23} Additional testimony was presented from Gary Ray, who stated that he worked at Trifecta Flooring and Solutions and that Durbin was one of the company's subcontractors in January 2024. Ray testified that Durbin drove a company van, and

8

that he returned the van on January 24, 2024.

{¶24} Boreing testified for the State. He explained that he was arrested on January 24, 2024, for possession of fentanyl, and that he was released from the Justice Center at approximately 3:00 or 4:00 a.m. that day. Boreing called Durbin, whom he described as his cousin and best friend, for a ride home. According to Boreing, he was released at the same time as N.H.[1] He and N.H. waited in the lobby of the Justice Center together and discussed the possibility of Boreing giving her a ride home. Boreing testified that he called Durbin to verify that he was willing to drop off N.H. Boreing had seen her use the ATM, and he told Durbin that N.H. had cash.

{¶25} Boreing testified that Durbin picked them up in his white work van. He sat in the back, while N.H. sat in the front passenger seat. Boreing stated that, as N.H. exited the van, Durbin reached over and tried to grab her purse. As Durbin and N.H. struggled, Boreing also grabbed the purse, but N.H. did not let go. Boreing stated that he shouted at Durbin, "Go. Go. Go," and that Durbin began to drive. Boreing was not aware that N.H. was dragged by the van. When asked about N.H.'s testimony that Durbin never attempted to grab her purse, Boreing stated that N.H. was lying.

{¶26} Boreing explained that Durbin had to turn the van around because the road reached a dead end. When they turned around, N.H. was standing in the street with her hands up. The State asked Boreing if the van hit N.H., and he responded, "[W]e swerved, I fell back because I wasn't in a seat, and I just felt a bump. And then I thought we hit a curb. And then we just took off from there." He testified that he asked Durbin if they had struck N.H., and Durbin told him that they had hit the curb.

{¶27} Boreing further testified that Durbin dropped him off at his home, and

---

[1] Boreing referred to this individual as "a female," but for clarity, and because the individual's identity is not disputed, we refer to her as N.H.

that the two of them returned the work van later that day. He stated that he was not promised anything in return for his testimony, and that he elected to testify because he felt terrible about this incident, which would not have happened had he not been using drugs.

{¶28} On cross-examination, Boreing testified that he was in active addiction in January 2024, that he used fentanyl every day, and that he felt very sick when he stopped using. Defense counsel asked Boreing if, in a jail call to Durbin after his arrest on January 24, 2024, he told Durbin that he was "sick as fuck" and "dying in here right now." Boreing initially stated that he could not recall if he had made those statements, but, after the referenced call was played in court, he agreed that he "may have said that." Boreing also agreed that during the call he concocted a story for Durbin to tell Boreing's fiancée about why Boreing had been arrested because he did not want his fiancée to know that he had been using fentanyl.

{¶29} Boreing further testified on cross-examination that he was initially given a straight bond of $300,000 after being arrested for the offenses committed against N.H. He stated that his attorney reached out to detectives and the State and told them that Boreing would give an interview. That interview was played for the jury but not admitted. The record indicates that, at the start of the interview, Boreing asked, "[I]s there, like, a bond?" He was released on bond after giving the interview.

{¶30} Durbin testified on his own behalf. He first discussed Boreing's addiction to drugs, including fentanyl, before addressing his own drug usage. Durbin explained that he had "dabbled" with fentanyl but had not developed an addiction.

{¶31} Durbin's testimony next addressed the charged offenses. He testified that he received a call from Boreing on January 24, 2024, asking Durbin to pick him up from the Justice Center. According to Durbin, Boreing never told him that a fellow

inmate needed a ride home, and he learned that N.H. needed a ride when he arrived at the Justice Center. After he agreed to take N.H. home, she sat in the front of his van.

{¶32}  Durbin testified that he did not speak with N.H. during the short drive. He stated that, after stopping the car to drop off N.H., he heard both Boreing and N.H. start screaming and heard Boreing yell, "Go, go, go." He immediately "floored it." The State asked Durbin when he realized that someone was being dragged by his van, and he responded, "Well, I didn't even know it was her. I just knew somebody was in the doorway with [Boreing], and when I turned left, they were gone. Like, I knew if I turned left at this speed, they're gone."

{¶33}  Durbin stated that he had to turn around in a parking lot because the road reached a dead end. He testified that he drove over two curbs to avoid N.H., and that he did not realize Boreing had taken N.H.'s purse until he was speeding away. After leaving the scene, Durbin took Boreing home and then returned to his own home. Durbin testified that he learned the following day that the incident with N.H. was more serious than he had realized. He explained that he did not tell Detective Kreider what Boreing had done because Boreing was like a brother to him.

{¶34}  Durbin also addressed why he had not turned himself in after learning of the warrant for his arrest, saying, "Look at me right now. I've been in jail for 10 months on a crime that I didn't commit. Would you turn yourself in and sit here for 10 months on something you didn't do?"

{¶35}  On cross-examination, the State questioned Durbin about his drug use, specifically his statement that he did not experience symptoms of withdrawal. The State asked Durbin if he had made a call to Addiction Services while incarcerated asking for more drugs because he was sick. Durbin admitted to saying that he had needed drugs but denied saying that he was sick.

**{¶36}** Another topic broached during cross-examination was the money that Durbin's girlfriend sent him on a regular basis while he was incarcerated, which Durbin stated was used to purchase food. The State then asked, "So when you get all of this money, it's not for purchasing tune?" Durbin admitted that he had purchased tune, which he explained was synthetic marijuana.

**{¶37}** The State also questioned Durbin about whether he had "an issue" with Detective Kreider, asking him specifically about a jail call in which he stated, "I know they're listening. This one is for you, Detective Kreider, you little dick fa***t." Durbin stated that Detective Kreider had "an issue" with him, not the other way around. He acknowledged that he was angry with the detective, stating, "I believe he has a vendetta against me since the very beginning when I told him to suck my dick, and I hung up on him."

**{¶38}** The jury found Durbin guilty of both felonious-assault charges, but it could not reach a unanimous verdict on the charges of aggravated robbery and robbery, which were subsequently dismissed. At sentencing, the trial court merged the two counts of felonious assault. On Count 3, for the offense of felonious assault in violation of R.C. 2903.11(A)(1), the trial court imposed a sentence of five years to seven years and six months of imprisonment.

**{¶39}** Durbin now appeals.

## II. Other-Bad-Act Evidence

**{¶40}** In his first assignment of error, Durbin argues that the trial court erred by admitting other-bad-act evidence—specifically, statements about his alleged drug use and inflammatory statements that he made about Detective Kreider.

**{¶41}** Evid.R. 404(B)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character" to show action in conformity

therewith. But such evidence is admissible to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). This rule embodies the common-law principle that "'proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime.'" *State v. Hartman*, 2020-Ohio-4440, ¶ 20, quoting *State v. Curry*, 43 Ohio St.2d 66, 68 (1975).

{¶42} In *Hartman*, the Court set forth a framework for considering the admissibility of other-act evidence. First, the proponent of the other-act evidence must set forth a specific purpose under Evid.R. 404(B)(2) for which the evidence is being offered, and the trial court must assess the relevance of the evidence to that particular purpose. *Id.* at ¶ 26; *see State v. White*, 2021-Ohio-1644, ¶ 47 (1st Dist.).[2] "The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Hartman* at ¶ 27. We review the trial court's determinations at this stage de novo. *White* at ¶ 47; *see Hartman* at ¶ 22 ("The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law.").

{¶43} Second, the prejudicial impact of the evidence must be weighed against its probative value. *Hartman* at ¶ 29; *White* at ¶ 48. As required by Evid.R. 403(A), evidence must be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *Hartman* specified that the trial court's Evid.R. 403 analysis must be "robust," and recognized that weighing the probative value of evidence against any prejudicial effect

---

[2] "Evid.R. 404(B) requires the proponent of other-acts evidence to provide reasonable notice of its use in advance of trial." *State v. Grubbs*, 2025-Ohio-1384, ¶ 40 (1st Dist.); *accord* Evid.R. 404(B)(2)(c). The State did not provide notice in advance of trial of its intention to use other-act evidence. But Durbin did not object to the lack of notice, nor has he raised the issue of lack of notice on appeal.

it may have "is a highly fact-specific and context-driven analysis." *Hartman* at ¶ 29 and 30. As such, the trial court's determination at the stage of the proceedings is reviewed for an abuse of discretion. *Id.* at ¶ 30; *White* at ¶ 48.

### A. Evidence of Durbin's Drug Use

**{¶44}** Durbin argues that the State used evidence of his alleged drug use to improperly attack his character, that his alleged drug use had no relevancy to the underlying charges, and that the prejudicial impact of this evidence outweighed its probative value. He argues that the other-act evidence of his drug use was admitted both during questioning by the State and in several of the recorded jail calls.

### 1. Questioning by the State

**{¶45}** Durbin first directs this court to an exchange that occurred during cross-examination when the State questioned him about money he received from his girlfriend while awaiting trial in the Justice Center. The following exchange occurred between Durbin and the State:

> STATE: So when you get all of this money, it's not for purchasing tune?
>
> DURBIN: I have.
>
> STATE: Okay. What is tune?
>
> DURBIN: Tune is a synthetic marijuana in the jail.
>
> STATE: It's not a fake or synthetic version of fentanyl or heroin?
>
> DURBIN: Absolutely not.
>
> STATE: And so it's not true that actually contraband [is] brought in through roach killer and lighter fluid and that the effects from it are actually that of fentanyl or heroin?
>
> DURBIN: You are misunderstood.

14

STATE: Okay. And you purchase a lot of tune in jail.

DURBIN: No. Not at all. Been months, actually.

STATE: Not just the other day?

DURBIN: No, ma'am.

. . .

STATE: So you would say that you were actually still on drugs while locked up for this offense.

DURBIN: No, ma'am.

STATE: Didn't you just say that you had purchased tune in the Justice Center[?]

DURBIN: Yes. But I was not on drugs. I was not actively using drugs every day.

STATE: But you were still doing drugs.

DURBIN: I have, yes.

Durbin did not object to this exchange.

**{¶46}** Durbin also argues that the jury heard impermissible other-act evidence when the State asked him during cross-examination about whether he had called Addiction Services from jail and told them that he needed more drugs because he was sick. Again, Durbin did not object to this question.

**{¶47}** Because Durbin failed to object to these questions about his drug use, we are limited to reviewing for plain error. *See State v. Knuff*, 2024-Ohio-902, ¶ 117 (where a defendant fails to object to other-act evidence below, the claim is reviewed for plain error); *State v. Shelton*, 2018-Ohio-3895, ¶ 28 (1st Dist.) (holding that, "because Shelton failed to raise an Evid.R. 404(B) objection below, we review the argument for plain error"). An appellant establishes plain error by showing "that an

error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial." (Cleaned up.) *Knuff* at ¶ 117.

**{¶48}** The State argues that this evidence concerning Durbin's drug use was relevant to establishing his motive for committing the charged offenses, which it asserts was to rob N.H. for money to buy drugs. This argument is in accordance with the theory of the case that the State advanced below, and is also supported by the State's closing arguments, in which it told the jury, "They wanted money. They're drug addicts. That's why [Durbin] continues to do drugs in the Justice Center. He admits to buying tune. Tune isn't a synthetic marijuana. It's synthetic opioids. And [Durbin] admitted that he continues to do that while locked up in jail."

**{¶49}** We find no plain error in the trial court's admission of evidence about Durbin's drug use while incarcerated. First, Durbin cannot establish that an error occurred, as we agree with the State that this evidence was relevant for the nonpropensity purpose of establishing Durbin's motive. *See Hartman*, 2020-Ohio-4440, at ¶ 26.

**{¶50}** Second, even if Durbin could establish that an error occurred in the admission of this evidence, he cannot establish that the error prejudiced him or affected the outcome of the trial. *See Knuff*, 2024-Ohio-902, at ¶ 117. The jury was unable to reach a verdict on the charges of aggravated robbery and robbery, and those charges were ultimately dismissed. And the record contains overwhelming evidence of Durbin's guilt with respect to his conviction for felonious assault. Not only did the testimony offered by Boreing and N.H. establish Durbin's identity as the driver of the vehicle that dragged N.H., but Durbin himself admitted to driving the van. Further, both N.H. and Gardner testified that the van dragged N.H. and ran over her, and N.H.

described her resulting injuries in detail. On this record, we cannot find that the outcome of the proceedings would have been different but for the admission of evidence about Durbin's drug use. *See id.*

### 2. *Statements in Jail Calls About Drug Use*

**{¶51}** Durbin further challenges the admission of two statements in the recorded jail calls that he argues constituted impermissible other-act evidence about his drug use. He challenges the admission of the statement, made by the person to whom Durbin was speaking, that "Julia had told me that you were doing heroin." He also challenges the admission of his own statement in another call that "I was still doing drugs."

**{¶52}** Durbin's counsel objected to the admission of the recorded jail calls in their entirety, arguing that "I would lodge a general objection to the jail calls being admitted. I understand that my client's statements are admissible, but I believe there's a lot of information within the calls that are not relevant. In addition, they contain hearsay throughout. I understand that some hearsay is permitted to provide context. However, I think it goes above and beyond that."

**{¶53}** In addition to this general objection, defense counsel objected to several specific statements contained within the calls. As relevant to this assignment of error, Durbin's counsel raised a specific objection to the statement, "Julia had told me that you were doing heroin." Counsel argued that this statement was hearsay and was extremely prejudicial. The trial court overruled Durbin's objection to this statement, stating, "I do believe that it is not hearsay. And further, I do not think it is so prejudicial as to outweigh any kind of probative value, which I concur is minimal in this circumstance. But I do believe it puts it in the context of the entire conversation."

**{¶54}** The trial court also overruled Durbin's general objection to the jail calls

in their entirety. It stated,

> And as to the entirety of the phone calls, for the most part, these are the statements of the defendant and they are the statements of a party opponent. The other information I don't believe is being offered for the truth of the matter asserted. And to the extent it has been agreed to, portions of this have already been redacted by the State of Ohio.

{¶55} While Durbin raised a general objection to the jail calls in their entirety, and a specific objection to the statement, "Julia had told me that you were doing heroin," none of his objections were based on impermissible other-act evidence. Rather, his challenges were on hearsay and relevancy grounds. As a result, the trial court never evaluated the statements now challenged on appeal to determine if they were in contravention of Evid.R. 404(B). We accordingly review these statements' admission under Evid.R. 404(B) for plain error. *See Shelton*, 2018-Ohio-3895, at ¶ 28 (1st Dist.) (reviewing for plain error because the defendant objected to the introduction of evidence on other grounds and failed to raise an Evid.R. 404(B) objection below).

{¶56} We find no error, let alone error that was obvious, in the admission of these statements, which, as previously explained, were relevant to establishing Durbin's motive. Nor can we hold that the outcome of the proceedings would have been different but for the admission of these statements. Again, as previously explained, the jury was unable to reach a verdict on the charges of aggravated robbery and robbery, the charges to which these statements about Durbin's drug usage were relevant. And the record contains overwhelming evidence of guilt with respect to Durbin's felonious-assault conviction.

### B. Inflammatory Statements About Detective Kreider

**{¶57}** Durbin next argues that the State presented evidence of highly inflammatory and derogatory statements that he made to and about Detective Kreider. He challenges the admission of Detective Kreider's testimony that Durbin told the detective to "suck his dick." He also argues that it was improper for the State to ask him on cross-examination if he had referred to Detective Kreider as a "little dick fa***t" during a jail telephone call.

**{¶58}** The State contends that these statements did not constitute character evidence but rather were admissible as admissions of a party opponent pursuant to Evid.R. 801(D)(2)(a). It notes that the trial court, when ruling on the admissibility of the jail calls, determined that most of the statements contained within the calls, including statements that Durbin made about Detective Kreider, were admissible as statements of a party opponent.

**{¶59}** Both the State's argument and the trial court's determination below conflate the admissibility of hearsay evidence and the admissibility of other-act evidence. Evid.R. 801(D)(2)(a) provides that a party's own statement is an admission of a party-opponent and is not hearsay. But the fact that a statement is not hearsay does not automatically render the statement admissible.

**{¶60}** In *State v. Kryling*, 2023-Ohio-1921, ¶ 39 (6th Dist.), the court considered the State's argument that it "should analyze the admissibility of . . . 'other acts' evidence under Evid.R. 801(D)(2) instead [of Evid.R. 404(B)]," and found the argument to be without merit. In that case, the State argued that "because the statements appellant alleges were improperly admitted were statements appellant himself made, including those statements referencing drug sales unrelated to the underlying offense, . . . the trial court's admission of those statements should be

reviewed under Evid.R. 801(D) as party admissions." *Id*. at ¶ 40.

**{¶61}** The Sixth District rejected that argument, explaining, "[E]ven if the Evid.R. 801(D) analysis the state requests was applicable here, the state's argument that a party admission is admissible as a matter of law is incorrect. While the admission of a party-opponent is not hearsay under Evid.R. 801(D)(2), this does not equate to admissibility at trial." *Id*. at ¶ 47. The court held, "'Admissions of party-opponents, although not hearsay, are still subject to the general rules of admissibility, including Evid.R. 401 and 403.'" *Id*., quoting *Bromall v. Select Specialty Hosp., L.L.C.*, 2022-Ohio-2496, ¶ 52 (8th Dist.).

**{¶62}** We thus hold that, even if Durbin's statements about Detective Kreider were admissions of a party opponent, a separate analysis was necessary to determine if the statements were admissible under Evid.R. 404(B).

**{¶63}** Durbin raised no objection below to the admission of either of the two statements that he now challenges on appeal, so we review for plain error. *See Knuff*, 2024-Ohio-902, at ¶ 117. It is questionable whether the two statements that Durbin now challenges even constitute other-act evidence that fall under the protections of Evid.R. 404(B). But we hold that, even if Durbin's statements about Detective Kreider were improperly admitted, no plain error resulted. The evidence that Durbin committed the offense of felonious assault was overwhelming, and we cannot hold that there is a reasonable probability that the outcome of the proceedings would have been different but for the admission of this evidence. *See id*.

**{¶64}** The first assignment of error is accordingly overruled.

### III.  *Admission of Arrest Video*

**{¶65}** In his second assignment of error, Durbin argues that the trial court erred by admitting a video of his arrest. He contends that the video had no relevance

to the indicted charges or the issue of flight, and that its admission violated his constitutional rights to due process and a fair trial. Durbin contends that the video left the jury with the impression that he was a dangerous person that could not be arrested absent an overwhelming show of force. He contends that rather than show the video, the State could have relied on witness testimony to establish that he was arrested at a hotel days after the offenses were committed.

**{¶66}** The video of Durbin's arrest was introduced through the testimony of Officer Knapp, who was assigned to the Fugitive Apprehension Unit and arrested Durbin on February 1, 2024. The State played a portion of the footage from Officer Knapp's BWC that depicted the physical arrest of Durbin, before pausing the video to ask Officer Knapp to explain why portions of the video were blurry. After the officer answered, the State resumed the video. At that point, Durbin objected.

**{¶67}** After the objection was raised, the trial court asked the State, "So is there any relevance to the remainder?" The State agreed that it was not necessary to resume the video. The court responded, "So I'm going to overrule the objection in regard to relevance now, understanding that we're going to stop the video now, because the rest of it is probably duplicative or gratuitous."

**{¶68}** Later, outside of the presence of the jury, defense counsel asked the court to clarify on the record its ruling on the objection. The court stated,

> My ruling is that the portion of the video that demonstrates the arrest at the hotel is relevant because, as I understand it, the State is going to argue that Mr. Durbin engaged in flight, and they requested a flight instruction, and this demonstrates that he is at this hotel for the purpose of the flight instruction, which I believe the State is asserting goes towards consciousness of guilt. So I would allow it, but only up to

the point that it was played.

And I do agree with much of the remainder would have been gratuitous or duplicative, and I think the State put on the record that it was a hotel and the location of the hotel, and there was no cross-examination regarding that. So I overruled the objection because I did believe that it was relevant to the request for the Consciousness of Guilt instruction.

**{¶69}** A trial court's admission of evidence will not be reversed absent an abuse of discretion and "proof of material prejudice." *State v. Neal*, 2022-Ohio-1290, ¶ 29 (1st Dist.). "The term 'abuse of discretion' implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Garry v. Borger*, 2023-Ohio-905, ¶ 14 (1st Dist.), citing *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).

**{¶70}** We find no abuse of discretion in the trial court's admission of the video of Durbin's arrest. The record establishes that Durbin checked into a hotel to avoid arrest for the offenses in this case. The law is clear that evidence of an accused's flight or concealment is admissible as evidence of consciousness of guilt.[3] *State v. Hand*, 2006-Ohio-18, ¶ 167; *State v. Morrissette*, 2018-Ohio-3917, ¶ 51 (1st Dist.). While the State could have, as Durbin suggests, relied on officer testimony alone to show that Durbin had attempted to conceal himself from the police and avoid arrest, the trial court did not abuse its discretion in allowing the State to introduce the BWC footage to show Durbin's concealment and flight.

---

[3] Of course, "admissible" does not mean "dispositive." *See State v. Smith*, 2025-Ohio-3131, ¶ 56 (1st Dist.) (approving instruction that informed the jury that "'leaving the scene alone does not raise a presumption of guilt'"); *see also State v. Echols*, 2023-Ohio-2206, ¶ 47-48 (1st Dist.) (Bergeron, J., concurring) (positing that it is "equally fair to presume that a defendant might [flee] because he believes he will be convicted, regardless of his guilt" and citing federal cases to support the proposition).

**{¶71}** The second assignment of error is accordingly overruled.

### *IV. Sufficiency and Weight of the Evidence*

**{¶72}** In his third and fourth assignments of error, Durbin argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

**{¶73}** A challenge to the sufficiency of the evidence requires us to determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Cleaned up.) *State v. Walker*, 2016-Ohio-8295, ¶ 12. In contrast, when this court reviews a challenge to the manifest weight of the evidence, it must "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 25.

**{¶74}** Durbin raises challenges to the sufficiency and weight of the evidence supporting the offenses of felonious assault in both Counts 3 and 4 of the indictment. But the offense of felonious assault in Count 4 was merged with Count 3 at sentencing, and no sentence was imposed for that offense. Absent the imposition of sentence, Durbin was not convicted of felonious assault in Count 4. *State v. Turner*, 2025-Ohio-386, ¶ 26 (1st Dist.). The law is well-settled that we do not consider arguments regarding the sufficiency and weight of the evidence supporting a merged offense. *Id.*

**{¶75}** In Count 3, Durbin was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides that "[n]o person shall knowingly . . . [c]ause serious physical harm to another." Durbin contends that he did not act knowingly. Pursuant to R.C. 2901.22(B), a "person acts knowingly, regardless of purpose, when the person

is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶76} The evidence presented established that Boreing grabbed N.H.'s purse as she exited Durbin's van. The van had not been in motion, but upon hearing Boreing shout, "Go, go go," Durbin started to drive. He argues that he did not know that N.H. was dragged by his van, but the evidence belies that contention. When asked at what point he realized that someone had been dragged, he responded, "Well, I didn't even know it was her. I just knew somebody was in the doorway with [Boreing], and when I turned left, they were gone. Like, I knew if I turned left at this speed, they're gone."

{¶77} Durbin admitted that he knew "somebody" was in the door of the van, and that if he turned at a certain speed, the person would be thrown. He was therefore "aware that [his] conduct [would] probably cause a certain result." *See* R.C. 2901.22(B).

{¶78} Durbin further argues that the evidence was not sufficient to establish that he drove over N.H. and that he caused her serious physical harm. This contention is not borne out by the record. Not only did N.H. and Gardner both testify that the van struck N.H., but N.H. repeatedly stated in her 9-1-1 call that "they ran me over." N.H. further testified that while she was dragged by the van, her "whole, like, legs and knees, and everything, was, like, being scraped and hit by the car that was parked." She also testified that she suffered bruised ribs, a punctured heart, and scrapes and bruises on her legs and elbows from this incident. She remained in the hospital for several days. This was sufficient to establish that Durbin caused N.H. serious physical harm. *See* R.C. 2901.01(A)(5) (defining "[s]erious physical harm to persons").

{¶79} We further hold that Durbin's conviction was not against the manifest

weight of the evidence. The jury was in the best position to judge the credibility of the witnesses. *See State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *State v. Shepard*, 2021-Ohio-964, ¶ 62 (1st Dist.). The jury was aware of Boreing's role in these crimes and that he was released on bond after cooperating with the State. It was entitled to consider that information when determining what weight to give his testimony. And the record establishes that the jury did not accept all of Boreing's testimony. Although Boreing testified that Durbin had been the first person to grab N.H.'s purse, the jury was unable to reach a verdict on the two robbery counts. We hold that this was not the rare case in which the jury lost its way and committed a manifest miscarriage of justice in finding Durbin guilty of felonious assault. *See Powell*, 2020-Ohio-4283, at ¶ 16 (1st Dist.).

{¶80} The third and fourth assignments of error are overruled, and the judgment of the trial court is, accordingly, affirmed.

Judgment affirmed.

**KINSLEY, P.J.,** and **MOORE, J.,** concur.